PERRY v. THE STATE.

1. A medical expert, after describing a wound and its location and giving his opinion as to the character of the weapon by which it was caused, may testify to the opinion that the blow came from the rear of the injured person. Any witness, after examining a physical instrument, may testify to the opinion that it is a deadly weapon.
2. It is competent in a trial for murder to prove that, shortly after the mortal wound was inflicted, the accused made declarations and did acts evidencing malice towards the injured person or indifference to his fate.
3. The law of circumstantial evidence is not, without qualification, applicable in a case where the State proves a positive confession of guilt.
4. It is not erroneous to refuse to charge requests which are inapplicable to the issues involved. An inaccuracy in charging which could have resulted in no injury to the losing party is not cause for a new trial.
5. There is, in a trial for murder, no error in rejecting evidence offered merely to affect the action of the jury on the question of punishment.
6. The verdict was warranted, and the record discloses no cause for a new trial.

Argued January 15,—Decided January 31, 1900.

Indictment for murder. Before Judge Reese. Wilkes superior court. November term, 1899.

*H. M. Holden* and *A. W. Stephens,* for plaintiff in error.

*J. M. Terrell, attorney-general,* and *R. H. Lewis, solicitor-general,* by *Harrison & Bryan,* contra.

LUMPKIN, P. J. At the last term of this court the cases of Will Taylor and Fred Perry, who had been jointly tried and convicted of the murder of Jep Dennard, were here on separate writs of error, upon each of which the judgment below was reversed. See 108 *Ga.* 384. At the next ensuing term of the trial court the accused were tried separately. Taylor was found guilty, and, under the recommendation made by the jury, sentenced to imprisonment in the penitentiary for life. This ended his case. Perry was convicted without a recommendation, and sentenced to be hanged. He made a motion for a new trial, to the overruling of which he excepted, and his case is again before us. The evidence warranted a finding of the following facts: Dennard, the deceased, in the capacity of "guard," had charge of a number of persons who had been convicted of misdemeanors and sentenced to work upon a chaingang. They were not, however, employed, as they ought to have been, upon public works, but under Dennard's supervision labored upon a private farm, and were not under the management or control of the county authorities. Taylor, Perry, and several others composed the gang. When not at work they were kept in one room of a house, the only remaining room of which was occupied by Dennard. There was no door between these two rooms. All of the convicts except Taylor, Perry, and two others were confined to a large chain. The two named were whispering to each other most of the afternoon of Sunday, January 8, 1899, and neither of them conversed with any other convict. While, under the rules promulgated by Dennard, all conversations had to be carried on in a low voice, there was no rule requiring the convicts to talk in whispers. The whispering between Taylor and Perry was an unusual occurrence. Late in the afternoon mentioned, Dennard from his room directed them to bring to him some articles which he needed. They went into

Dennard's room and remained there one or two minutes.   There was a scuffle in the room and a noise as if something had fallen. While these men were in Dennard's room, he received upon the head a mortal wound from which he soon became unconscious and as a result of which he died the next day.   The wound was inflicted with a stick of wood which was a weapon likely to produce death.   The indications were that the blow came from Dennard's rear.   Immediately after he was struck, Taylor and Perry returned to the room of the convicts, the former in advance, having in his possession Dennard's gun, pistol, and watch, and Perry following closely with an axe in his hand.   Neither said anything as to what had happened to Dennard until Perry, upon being asked the direct question: "Where was he sitting at when you all hit him?" replied: "He was sitting by the fire when us hit him."   Taylor took the axe from Perry and with it broke the lock on the large chain, thus releasing from it all the convicts whose shackles were thereto attached.   They all went out of doors.   Dennard, who was standing near the house, asked, "What's the matter here?" and spoke no more, being in a dazed and helpless condition.   Referring to him, Perry said: "Put him in there [meaning in the house], God damn him, and let's go."   He and Taylor then placed Dennard in the house and fastened the door so that it could not be opened from the inside. All the convicts then fled from the place, Perry taking with him Dennard's gun.   About two hours later, from a place of concealment by the roadside, they saw a physician who was going to Dennard's relief.   Perry proposed to kill the doctor, and when one of his companions remonstrated, threatened to kill the latter.

To the foregoing, which is a condensed but accurate statement of what the jury could legitimately conclude took place on the day of the tragedy, it is proper to add what follows: Perry, after his arrest, admitted that he was in Dennard's room when the fatal blow was inflicted, and, without charging the crime upon Taylor or confessing or denying his own guilt, simply said he did not know who struck the blow.   In his statement to the jury he denied being in Dennard's room at the time the crime was committed, and protested that he had nothing whatever to do with the homicide.   He also stated that a few days before the

day of the crime Dennard had given him a severe flogging, and on that day had not allowed the convicts enough to eat. Taylor, who had already been convicted and sentenced as above stated, was sworn as a witness for Perry, and testified positively that he (Taylor) struck the blow which killed Dennard, because Dennard threatened to whip him and was about to do so; that Perry was not present at the time and had nothing whatever to do with it; and further, that there was no conspiracy or understanding of any kind between Perry and himself to kill or harm Dennard. He explained the "whispering" by stating that it related to another matter, the particulars of which he undertook to relate. There was absolutely nothing in Taylor's testimony to the effect that he struck Dennard in order to escape from custody. Indeed, there was not a syllable of evidence that the blow was struck for any such purpose. On the contrary, Taylor testified positively and unequivocally that the crime would not have been committed if Dennard had not tried to whip him, and gave no other reason for striking Dennard. He used the expression, "I struck through fear," manifestly meaning the fear of a beating. He did testify he had been told it was an unlawful chain-gang, but said nothing in this connection about escaping therefrom. He mentioned the character of the chain-gang merely as a justification for freeing the other convicts after he had struck Dennard, and gave as an additional reason for setting them at liberty that he thought his chances for avoiding capture would be better if many convicts were at large at the same time. For the purpose of impeaching Taylor, the State proved that after his arrest he repeatedly stated that Perry struck the fatal blow, and also that he (Taylor) did not know who struck it. We will now consider the grounds of the motion for a new trial.

1. It is alleged that the court erred in allowing the physician to testify that, in his opinion, the mortal blow was inflicted from Dennard's rear; and in allowing another witness to testify that the stick of wood with which the blow was struck was a weapon likely to produce death. There was no error in admitting any of this testimony. The physician was not only an expert, but based his opinion upon the facts which he stated; and certainly, any witness, after describing an instrument, may express under oath the opinion that it is capable of causing death.

2. Error is alleged in admitting the testimony relating to Perry's proposition to kill the doctor, and his threat to kill the person who protested against his so doing. This testimony was admissible. It tended to show declarations and conduct on Perry's part evidencing malice against Dennard or indifference to his fate. Such declarations and conduct are in the nature of incriminating admissions of the existence of malice.

3. The court was requested to charge upon the law of circumstantial evidence, the request being evidently based upon the theory that there was no direct evidence of Perry's guilt. We can not say the request was improperly refused, for there was evidence of a confession that Perry actually participated in the killing, and such evidence is not circumstantial but direct. *Eberhart* v. *State,* 47 *Ga.* 599.

4. Several requests to charge were presented to the judge, with the object of having the jury instructed that if Perry conspired with Taylor merely to commit an assault and battery upon Dennard for the purpose of effecting an escape, he would not be chargeable with the homicide; or that even if Perry entered into a conspiracy to kill Dennard, or himself killed Dennard for the purpose of escaping from the chain-gang, it being an unlawful one, he would be guilty of manslaughter only. Error is assigned upon the refusal of the court to give these requests to the jury, and also upon a charge that "Where men combine to do an unlawful act, and one goes a step beyond the rest and does acts which they did not perform, each and all are responsible for the act." There was no evidence tending to show a conspiracy merely to beat or disable Dennard. If there was any conspiracy at all, it was murderous in its character, and there was not a particle of evidence that the attack upon him was made with a view to escaping from the chain-gang. Perry did not in his defense set up either that he co-operated with Taylor in a design to merely commit an assault and battery on Dennard, or that his object, whatever may have been the nature of the assault, was simply to effect an escape. The sole theory of his defense was that he was absolutely guiltless of any participation whatever in the attack upon Dennard. He therefore has no just cause of complaint of the court's refusal to charge as requested.

The requests were not pertinent to the issues actually involved; and even if the charge excepted to was not technically accurate, it could not, under the circumstances, have been injurious to Perry. There was no contention on his part that he and Taylor conspired to do one act and that the latter did an act more criminal, in the design of which he (Perry) did not participate. So far as the requests related to the unlawful character of the chain-gang, it is to be noted that no assault of any kind upon Dennard was in the least degree essential to an escape by either Taylor or Perry from the chain-gang. They had absolute control of their own movements, and had only to leave whenever they chose to do so. In view of the undisputed facts, the theory of assaulting or killing Dennard in order to escape has no foundation whatever, and it follows that the question of the lawfulness or the unlawfulness of the chain-gang is, in the case as now presented, an entirely immaterial issue.

5. The jury trying Perry knew that Taylor had been convicted. He so testified. Counsel for Perry tendered in evidence the verdict against Taylor for the purpose of showing that he had been recommended to mercy. The court declined to allow this proof. It is alleged that this was error, for the reason that if the jury had been informed that Taylor had escaped the death penalty, they might have recommended Perry to mercy. In other words, a new trial is asked because of the exclusion of evidence which might have affected the punishment of the plaintiff in error. "If the courts ever begin to grant new trials solely with reference to the question of changing penalties, they will embark upon a wide ocean of uncertainty. What evidence, other than such as would be pertinent to the question of guilty or not guilty, would be appropriate? An answer to this inquiry is suggestive of endless irrelevancy." Thus we dealt with this question in the case of another *Perry* v. *State*. See 102 *Ga.* 379. Even if we entertained a different view of it, we do not see how the course pursued by one jury, with reference to punishment, on the trial of one man, could aid another jury trying another man in fixing his penalty. The evidence, though relating to the same transaction, could not possibly be the same on both trials, and therefore what the first jury did could afford

no lawful guide or criterion to the other; and besides, each jury had to act on its own responsibility.

6. Complaint is made that the verdict is contrary to the evidence. We can not sustain this contention. We do not, of course, mean to say that the evidence demanded a finding of the particular facts which we said above was warranted. It is obvious from the foregoing preliminary statement as a whole that the jury might have made a very different finding; but, in dealing with the question whether or not there is sufficient evidence to support a verdict, we are constrained to treat as duly established all such facts as are warranted by testimony and to give the prevailing side the benefit of every inference favorable to it which is fairly and legitimately deducible from those facts. Following this course, which is the only one we can properly pursue, we can not say the evidence was insufficient to satisfy the jury to the exclusion of all reasonable doubt that Perry was guilty. Thus viewing the case, there was mysterious and unusual whispering between him and Taylor. At the first opportunity thereafter, they went into Dennard's room. Almost immediately he received a mortal blow from the rear. They came out of his room at about the same moment. Perry made no protestation that he was innocent of the terrible deed, which would have been most natural, had he been guiltless of Dennard's blood. On the contrary, he voluntarily said "us hit him." This was a direct confession of guilt. He cursed the helpless man, assisted in fastening him up in the house, and remorselessly left him to his fate. He carried away Dennard's gun, proposed to kill with it a physician who was going to his relief, and threatened to kill a fellow-convict who protested against the murder of the doctor. Later, Perry admitted being present when the wound was given, and did not even then claim to be innocent, but merely professed ignorance of who the murderer was — ignorance which could not have been real if what he admitted was true. In his statement at his trial he disclosed reasons for entertaining malice against Dennard, viz., that the latter had flogged him and refused to give him enough food. It was, under all the circumstances, certainly remarkable that Taylor should under oath take all the blame upon himself; and if the jury had

believed his testimony, they would surely have acquitted Perry. But they did not believe Taylor, and with good reason, for he was involved in such serious self-contradictions that no man could help feeling he was totally unworthy of credit. Our remark when this case was here before that the evidence against Perry "was exceedingly weak and- unsatisfactory" would not apply to the present record. The State's case is much stronger that it was then. The charge of the court was full and very fair to the accused. As a whole, it was an admirable presentation of the law applicable to the issues upon which the jury were to pass. After a patient and careful examination and study of the record, we find no reason which would justify us in holding that Perry's last conviction was unlawful. It does seem anomalous that he should suffer the death penalty, while Taylor, confessedly guilty and swearing to Perry's innocence, escapes with life imprisonment; but for this condition of things no responsibility rests upon us, or his honor of the trial court.

*Judgment affirmed. All the Justices concurring, except*

LITTLE, J., dissenting. I base my dissent from the ruling of the majority in this case on the two grounds, that the evidence does not sustain the verdict which was rendered and that the court erred in admitting the evidence of Dr. Quinn, who testified: "I think Mr. Dennard [the deceased] must have been sitting and his assailant must have made the attack from behind." There has been no attempt to reproduce the evidence. It is voluminous, and I shall not give any part of it in detail. It is sufficient to say, that there was no eye-witness to the homicide—that no one saw the accused enter the room where Dennard was slain—he says he was not there. Taylor, who had been previously convicted of the homicide, admitted that he alone killed Dennard, and swore on the trial that Perry was not in the room at the time he struck the blow that caused the death of Dennard. Circumstances strongly corroborated this evidence. Immediately after Dennard had been stricken, Taylor entered the room where the other prisoners were confined, having in his possession a gun, pistol, and watch belonging to Dennard, all of which were in the room where the blow was stricken. It is true that Taylor was followed into that room by Perry,

who had an axe in his hand. It was not shown that the axe was in the room where the homicide was committed, but most likely it was in the yard where Taylor says Perry was, at the time Taylor says he struck Dennard. Evidence of a conspiracy between the two to kill Dennard, in view of the conviction of the plaintiff in error, I must characterize as being to me painfully absent. In my opinion, it must rest alone on the fact that he had an axe in his hand after Dennard had been stricken and when he entered the room where the other prisoners were confined. For aught that appears, we are not authorized to conclude that he had it at the time of the homicide. As a matter of fact there was but one blow inflicted on Dennard, and that was not with an axe. He was, according to his own statement and the evidence of Taylor, out in the yard when Dennard was killed, having, as they say, asked and received permission of Dennard to go into the yard, previously to the difficulty. That he had an axe in his hand when he followed Taylor into the room where the prisoners were confined, was certainly a circumstance to create suspicion — would very strongly do so if it had not been shown to what use the axe was put. After Perry entered the room with the axe, Taylor took it from him and broke the lock on the large chain to which they were confined, thus freeing all the prisoners. Was it likely, if Taylor and Perry had conspired to kill Dennard, that they would not have acted together in overpowering him? What might have been a dangerous act to one alone, would have been reasonably safe for two. Again, is it reasonable to believe, if Taylor and Perry were together in the room when Dennard was slain, and his gun, his pistol, and his watch taken, that Perry would not have gotten one of the articles? Yet Taylor came out with all of them. These facts add to the positive evidence of Taylor, that Perry was not in the room and had nothing to do with the homicide, considerable weight. Very much of the testimony was derived from persons confined on the chain-gang at the time. None of them, however, went to the extent of testifying to any facts which would of themselves authorize a conviction. If the evidence of Taylor that Perry had nothing to do with the homicide and was not in the room at the time it was

committed is to be doubted — when all of this testimony went directly against his own interest — because he was a negro convict, why should credence be given to the testimony of other negro prisoners serving their country in a like capacity?

I do not think that the evidence of Dr. Quinn, who testified over the objection of plaintiff's counsel that "I think Mr. Dennard must have been sitting and his assailant must have made the attack from behind," should have been admitted. It is said by Mr. Justice Lumpkin, in the foregoing opinion of the majority, that the physician was not only an expert, but based his opinion upon the facts which he stated. In my judgment, one sensible, observant man, who is not a physician, could have just as readily known that Dennard was sitting and that he was struck from behind, as another such, who was a physician, and yet I do not think it can be doubted that neither one of them would know much about it. This character of evidence does not come within the domain of expert evidence. Because a man happens to be a physician, he is not thereby invested with any special power to know accurately what was the position of the parties when a homicide was committed not within his presence. Of course, if Dr. Quinn did give the facts upon which his opinion was based, his evidence was admissible, and so would have been the evidence of a layman. But I do not think he did. Dr. Quinn testified that he was called to see Dennard about 18 hours before his death; he was perfectly unconscious, in a profound stupor, caused from a blow inflicted upon his head, causing a fracture or rather several fractures. The doctor thought the weapon with which the blow was inflicted must have been about 3 inches in diameter, a round instrument; there was a central fracture and then a surrounding fracture, and the instrument must have had a knot on it, and the central fracture must have been produced by that knot; he thought it was a piece of wood. Adjoining that was another fracture of less degree. The fracture was about three inches wide and three and a half inches long. The fracture was on the right side of the head. It produced paralysis of the left side, the opposite side, and unconsciousness. The flow of blood was caused from a rupture of some of the cerebral vessels. The direction of the wound was

about on a level. " T think Mr. Dennard must have been sit-
ting, and his assailant must have made the attack from behind.
I. think the wound was nearly on a level—I mean it was straight
across the head above the ear. I think the wound was about
on a level with the pinnacle of the ear, but posterior some two
inches perhaps. I mean the wound was about two inches in
rear of the ear, nearly on a level." While I have not attempted
to give all of the further description of the wound made by Dr.
Quinn, the above is what precedes the testimony which was ob-
jected to, and to me it appears that this testimony was admitted
as expert evidence, because the description given of the wound,
preceding the testimony to which objection was made, would not
of itself seem to afford any reason for the opinion that the person
who was stricken was sitting at the time, and that the person who
inflicted the blow was in his rear. But, aside from this, the
admission of the testimony did not seem to have been based so
much on the reasons given for the opinion, as that it came from
an expert. The evidence was very harmful to the plaintiff
in error, if the jury believed that there was a conspiracy between
Taylor and himself to kill Dennard. As I do not think that the
evidence can be brought in the class of expert testimony, I think
it should not have been admitted, unless some distinct reason had
been given for the opinion. For the reasons above stated, I
have been unable to concur in the opinion of the majority of my
brethren. I think a new trial should have been granted.