## FITZPATRICK *v.* THE STATE.

1. In order for dying declarations to be admissible in evidence in a prosecution for homicide, such declarations must be made by a person in the article of death, who is conscious of his condition, as to the cause of his death and the person who killed him.

(*a*) The evidence submitted to the court was sufficient to make out a prima facie case that the declarations were made by the deceased in articulo mortis, as to the cause of his death and the person who killed him, and that at the time of making them he was conscious of his condition; and there was no error in submitting them to the jury under proper instructions.

(*b*) While the charge complained of was not entirely accurate, it is not cause for reversal.

2. The evidence, considered with the defendant's statement, authorized the charge to the jury on the subject of mutual combat; and the charge was not erroneous for any reason assigned.

3. On the trial of this case the following instruction to the jury was not erroneous: "When a homicide is proven, the presumption is that the

killing is murder, and that it is for the evidence to show justification, or to reduce the offense to a lower grade; and it is incumbent on the prisoner to show this to the satisfaction of the jury, unless it is shown from the evidence produced against him."

4. The evidence authorized a charge on the subject of flight.

5. Where during the trial of a criminal case evidence was admitted without objection, an omission to charge the jury that the only purpose for which the evidence was admitted was to impeach a witness is not cause for the grant of a new trial, where no written request was made that the judge limit the effect of the testimony to that purpose.

6. In view of the contradictory affidavit of the foreman of the jury, which by consent was made a part of the record, the conduct of the juror in separating himself from the jury during the consideration of the case is not cause for reversal.

7. The other grounds of the motion for new trial, so far as they are sufficient to raise any question for consideration, are not of such character as to require elaboration, and show no cause for reversal.

No. 1135. APRIL 18, 1919.

Indictment for murder. Before Judge Hodges. Madison superior court. June 20, 1918.

Joel T. Fitzpatrick, otherwise known as Blue Bird Fitzpatrick, was indicted for the murder of Jack Embry. On the trial the jury returned a verdict of guilty, with a recommendation to the mercy of the court. The defendant excepted to the refusal of a new trial. The evidence tended to show that he and Embry and some other persons had gone into a schoolhouse about sunset to play at cards. They were all drinking. A dispute over a game of cards arose between Fitzpatrick and another player. Embry was appealed to, to settle the question in dispute. In response he rose on his elbow and said, "Blue, I think you are wrong." Whereupon Fitzpatrick became enraged, cursed Embry, and shot him twice.

It was contended by the accused that the deceased was engaged in the game; that when the difficulty began he started towards the accused with his hand in his pocket; that the accused saw something "bright" in the hand of the deceased, and thinking it was a pistol, the accused shot "at the ceiling to scare him," and threw his hand down and shot the deceased. A witness testified that he took a pair of knucks off the hand of the deceased after he was shot. There was testimony of his dying declarations as to the cause of his death and the person who killed him. He died about eighteen days after he was shot.

*Thomas & Thomas, Thomas J. Shackelford,* and *Berry T. Moseley,* for plaintiff in error.

*Clifford Walker, attorney-general, A. S. Skelton, solicitor-general, M. C. Bennet,* and *Gordon & Gordon,* contra.

HILL, J. (After stating the foregoing facts.)

1. Error is assigned, in the first special ground of the motion for new trial, because the court admitted in evidence, over objection, the testimony of Dr. W. B. Hardman, the attending physician and surgeon, who testified as to the declarations of the deceased as to the cause of his death and the person who killed him. These declarations were made on several occasions between the first and last visits of Dr. Hardman to the deceased. The last declaration was made about five or six days before his death. In each of these declarations he said to Dr. Hardman that he could not live. After making an examination of the wounds the witness told the deceased that he was going to die. The deceased said he believed it. The witness said, "It is very plain you are going to die, and in your present condition there is no hope in the world for you." Dr. Hardman further testified: "I did not say 'without an operation.' . . I said, 'There is no chance for you; now if you are willing to take a shot at it, I am; and if this cord [spinal cord] is just being pressed on, instead of cut in two, I might relieve you, that is, give you some function of your cord; but if there is no pressure there, I can't do you any good. I want you and your family to understand that.' . . I did not say I could relieve him; I said the chances were that the function could be relieved. I have operated on them as bad as he was. I told him that, after he made the statement. He said he would take a shot at it. As to that meaning that he had some hope, it was to see whether it was pressure or the spine was cut; the x-ray did not show it. That being true, under my opinion, as to his certainly having some hope that I would find pressure there instead of a cut, he was willing to grab at last straw; and so was I, if he was willing. He was still grabbing then and still hoping that I would benefit him; . . he said it meant death anyway, regardless of operating or whether I did not operate, it was death anyway. He made that statement several times. . . He was in a dying condition at the time he made that declaration as to who shot him and how it occurred. A man may be in a dying condition and may be saved. He may have a big

blood-vessel bleeding and be in a dying condition until somebody stopped it. Sometimes a man can be absolutely saved when he was in a dying condition. . . He told me exactly the position he was in [when shot]. He said he was lying on the bench in the schoolhouse, asleep, and he heard some of the boys disputing about a certain matter, he never told me. He said, 'I heard the boys disputing about a certain matter, and some of them asked me.' He said, 'I kinder waked up and turned over, and some of them asked me what I thought about it, and I told them about what I thought it ought to be.' He said, 'Blue Bird Fitzpatrick then said, 'What have you got to do with it, you gray-headed son of a bitch?' and said, 'I turned over just a little bit, and he shot me.' He said he thought he got up on his elbow kinder, and he shot through the shoulder this way [indicating]. This is all I could get out of him. That is about the statement he made. He told me his condition that night, whether he was drinking or sober. He said he was sober. He said he had been asleep, but said he was sober. He told me about the time of night that happened. I think he said somewhere about nine o'clock. He did not tell me anything about how many drinks he had taken." The objection to the evidence was that it did not disclose that the deceased was in articulo mortis and conscious of his condition at the time of making the declarations; and it is argued that inasmuch as the deceased, at the time he made the declaration, was willing to submit himself to an operation, he had hope of an operation prolonging or saving his life, and that therefore he was not in the article of death and conscious of being in a dying condition. But it will be seen from the evidence of Dr. Hardman that the deceased always said, before and after the operation, that he would die, and that he was conscious of his condition. Dr. Hardman also testified that in his opinion the declarant was in a dying condition; that he was slowly dying. The evidence discloses that the deceased, at the time of the declaration, was paralyzed "from the stomach down," and that he was conscious of his condition and made the statement that he could not recover. The attending physician and surgeon had also declared the wound a mortal one. The nature of the wound, and the oft-repeated declaration of the deceased that he realized he would die from the effects of the wound, made such a prima facie case as to make it proper for such declarations to go

to the jury under proper instructions from the court. That death did not ensue immediately after such declarations would not make such statement inadmissible. Dying declarations made on Friday before declarant's death on Wednesday following have been held by this court to be admissible. *Bryant* v. *State,* 80 *Ga.* 272 (4 S. E. 853). In *Jackson* v. *State,* 56 *Ga.* 235, where some of the declarations were made on Friday, and others previously, and the deceased died on Saturday, such declarations were held to be competent. In that case the deceased said, when the statement was made, that he "was certain to die." The real test is, in such cases, whether the declarations are made by a person in the article of death, who is conscious of his condition, as to the cause of his death and the person who killed him. We think this case comes up to that test. Penal Code, § 1026, *Harper* v. *State,* 129 *Ga.* 770 (3), 773 (59 S. E. 792); *Jones* v. *State,* 130 *Ga.* 274, 276 (60 S. E. 840); *Young* v. *State,* 114 *Ga.* 849 (40 S. E. 1000); *Washington* v. *State,* 137 *Ga.* 218, 221 (73 S. E. 512); *Findley* v. *State,* 125 *Ga.* 579 (54 S. E. 106); *Bryant* v. *State,* supra.

Error is assigned, in the second ground, on the following charge: "The court has admitted to you evidence of dying declarations of the deceased. I charge you that you should consider such testimony with great caution, and before you should consider the same you should be satisfied that such declarations were conscious utterances in the contemplation and the immediate article of death, and you are to pass finally for yourselves on the question whether or not the declarations were conscious utterances in the contemplation and immediate article of death." The criticism is that by this language the court assumed that the declarations were in fact dying declarations; and that instead of saying the jury should "consider such testimony with great caution," the court should have charged that such testimony should be *received* with great caution. While the charge was not entirely accurate, it is not cause for reversal.

2. The evidence, considered in connection with the defendant's statement at the trial, authorized the following charge to the jury on the subject of mutual combat: "I charge you in this case that if you believe from the testimony, including the defendant's statement, that the defendant and the deceased had a mutual intent to fight, or a fight had begun between the deceased and the defend-

ánt and carried on, or had begun, both parties being at fault, and the defendant killed the deceased, the defendant cannot justify the killing in this case without showing that it was absolutely necessary. If, under such circumstances as I have just related to you, it is shown to you that it was absolutely necessary for the defendant to shoot the deceased, Embry, then you should acquit the defendant. On the other hand, if under such circumstances just related to you it is shown to you that it was not absolutely necessary for the defendant to shoot the deceased, then you would be authorized to find the defendant guilty, not of murder, but of voluntary manslaughter. It is only in cases of mutual combat, or where there is a mutual intention to fight, and both parties are at fault, that it becomes absolutely necessary for the defendant to kill in order to justify a killing." This charge is not erroneous (as alleged in the third ground) in that it expressed an opinion that the defendant was at fault. Even if it was erroneous for any reason, it was more favorable to the accused than he was entitled to. *Park* v. *State,* 126 *Ga.* 575 (10), 576 (55 S. E. 489).

3. Error is assigned, in ground 6, on the following charge to the jury: "When a homicide is proven, the presumption is that the killing is murder, and that it is for the evidence to show justification, or to reduce the offense to a lower grade; and it is incumbent on the prisoner to show this to the satisfaction of the jury, unless it is shown from the evidence produced against him." It is insisted that this was erroneous, for the reason that the presumption of innocence was in favor of the defendant until his guilt was established beyond a reasonable doubt; and that when a homicide is shown, there is no presumption that such killing is murder, and no burden is put upon the defendant to show his innocence, or to show that the grade of the offense was one lower than murder. This complaint of the charge is controlled by the principle ruled in the case of *Mann* v. *State,* 124 *Ga.* 760 (53 S. E. 324, 4 L. R. A. (N. S.) 934), where it was held that in the trial of one indicted for murder, where the evidence adduced to establish the homicide presents two conflicting theories of fact, one based upon circumstances indicating malice, and the other upon warranted inferences which negative its existence, it is proper in such case to charge the jury that the law presumes every homicide to be malicious, until the contrary appears from cir-

cumstances of alleviation, or excuse or justification, and that it is incumbent on the prisoner to make out such circumstances to the satisfaction of the jury, unless they appear from the evidence produced against him.

4. Headnote 4 disposes of ground 8, and requires no elaboration.

5. Jesse Black, as a witness for the defendant, testified that when the shooting took place he was lying on a desk, asleep; that the first thing he heard was a shot, and after the pistol fired he went to Mr. Embry and pulled his shirt back and saw where he was shot; that Fitzpatrick walked out of the door; and that he took a pair of knucks off the hand of Embry and put them back in his pocket. The State, in rebuttal, offered the testimony of Mrs. Embry and her son, Watson Embry, to the effect that Jesse Black told them, shortly after the homicide, that Fitzpatrick shot Embry and that he had "no more right to shoot him than I did to rise up and shoot Watson," that Embry was doing nothing at the time he was shot, but was lying down on a bench, that he (Black) and the defendant were engaged in a dispute over a game of cards and called on Embry to settle the dispute, that deceased stated that he thought Fitzpatrick was wrong, whereupon defendant cursed and shot him. In grounds 10 and 12 of the motion for new trial it is complained that the judge in charging the jury did not limit the application of this testimony to the subject of impeachment of the witness Black. There was no request, written or otherwise, for the judge thus to limit the consideration of the evidence. The law on the subject of impeachment generally had been given by the court to the jury; and in the absence of a written request to charge the jury to limit the consideration of the evidence to the question of impeachment, the failure of the court so to instruct the jury is not cause for a new trial. *Helms* v. *State,* 136 *Ga.* 799 (4), 803 (72 S. E. 246). The ruling in the case of *Jones* v. *Harrell,* 110 *Ga.* 373 (35 S. E. 690), is not controlling here. On the trial of that case Jones, the husband, was asked if he had not told certain persons that he was agent of his wife. He denied this. A witness was introduced to show that the husband had represented himself to these persons as such agent. This testimony was objected to, the objection was overruled, and the evidence was admitted for the purpose of contradicting the husband; the judge

6

remarking at the time that he would charge the jury as to the effect of it. But the judge failed to charge as to this matter, and the failure to do so was excepted to. This court held in that case that the judge should have explained the matter to the jury, and have properly limited the effect of the evidence. In the instant case there was no objection to the admission of the evidence; and it was offered solely for the purpose of impeaching the defendant's witness, Jesse Black. The jury no doubt so considered it. The attention of the court was not called to the impeaching evidence with a request to charge the jury as to the effect of the evidence. In the absence of a timely written request for the court to limit the effect of the evidence to the question of impeachment, this omission to charge will not be cause for a new trial.

6. The thirteenth ground of the motion for new trial complains that after the case had been submitted to the jury, and while they were considering the case at night, before any verdict had been reached, their foreman, W. P. Dean, separated himself from the jury and went a considerable distance, not in company with an officer, to the home of D. H. Cox, and entered said home and communicated with and held a conversation with Cox. It is alleged that this conduct of the juror was without the knowledge or consent of movant or his counsel, and was not known to them until after the verdict; and that the juror had opportunity to hear the case discussed on the streets of the town in which the case was being tried, or in the home of Cox. In the light of the contradictory affidavit of Dean, the juror, which by consent was made a part of the record, the conduct of the juror in separating himself from the jury is not cause for reversal. The juror in his affidavit testified that on the morning after the trial had been concluded, and before the jury had made its verdict, the jury returned about daylight to the court-house to resume their deliberations of the case, and when they arrived at the court-house they found the doors locked. Members of the jury asked who had the keys. Deponent stated that D. H. Cox was the keeper of the court-house, and that in all probability he had the keys. Deponent was requested to go to the home of Cox, which was in sight of the court-house and of the place where the jury were at that time. Deponent went to the home of Cox, who, in response to his knock on the door, invited him in; but he did not go in. He stated to Cox that the jury

wanted to get in the court-house, and that he had come after the keys. Cox asked if the jury had agreed on a verdict; to which deponent made no reply. Cox gave him the keys, and he returned immediately to the jury who were awaiting his return. Nothing was said about the case, other than the question asked him by Cox. Deponent was away from the jury not over ten minutes in going to and from the home of Cox. He did not see or meet any one else and had no conversation with any other person. At no time during the trial did he discuss the case with any person or persons other than the jury in deliberating thereon. The bailiff in charge of the jury remained with the eleven while deponent was away from them on the mission to Cox's home.

7. The other grounds (4, 5, 7, 9, 11) of the motion for new trial, so far as they are sufficient to raise any question for consideration, are not of such character as to require elaboration, and they show no cause for reversal.

　　　　*Judgment affirmed. All the Justices concur, except*

ATKINSON, J., dissenting. Where, in rebuttal of a witness for the defendant, the State introduces evidence of previous statements by the witness, contradicting his testimony delivered at the trial, and the contradictory evidence is of such character as that it might be understood by the jury to apply to the main issue in the case, and, if so applied, would be injurious to the accused, it is the duty of the judge, without request, to so charge the jury as to limit the application of the contradictory evidence to the impeachment of the witness. Under the facts of this case the omission to charge as just indicated was cause for reversal. *Jones* v. *Harrell,* 110 *Ga.* 373 (5), 381 (35 S. E. 690), where this court held: "If the husband be introduced as a witness and deny making such declarations, evidence tending to show that he did make them is admissible, not for the purpose of establishing the agency, but only to contradict him; and the trial judge should so instruct the jury."