## GREER *v.* THE STATE.

1. The evidence was sufficient to warrant the verdict of guilty of murder.
2. In the examination of witnesses by counsel in the trial of cases, a wide discretion must necessarily be left to the presiding judge, and unless this discretion is abused it will not be controlled. It was not abused in the present case.
3. In the trial of one charged with murder it is not error for the court to charge the jury that "The law presumes every homicide to be malicious until the contrary appears from circumstances of alleviation, excuse, or justification, and it is incumbent upon the defendant to make out such circumstances to the satisfaction of the jury, unless they appear from the evidence produced against her."
4. Under the evidence the court did not err, for any reason assigned, in giving in charge section 65 of the Penal Code, and in doing so using the word "certain" for "sudden," which was obviously a slip of the tongue, and was not calculated to confuse and mislead the jury.
5. It was not error for the reasons assigned for the court to exclude from the jury the evidence set out in the fifth division of the opinion.
6. The evidence relied on for conviction was not entirely circumstantial in character; and the court therefore did not err, in the absence of an appropriate written request, in failing to instruct the jury on that subject.
7. "While the good character of the accused person is a substantive fact and evidence of such fact should be weighed and considered by the jury in connection with all the other evidence in the case, still, such good character of the accused is not a distinct substantive defense. A proper instruction should be given in every case where the accused puts

his character in issue; but in the absence of a timely request, an omission to give a specific charge on the subject will not require a new trial. It is only in exceptional cases where the court fails to charge relatively to the good character of the accused that a new trial should be granted." The present case falls within the general rule and not within the exception.

8. It was not error for the court to charge the jury as follows: "Juries are not empaneled and sworn to acquit," where in immediate connection therewith the judge also charged: "Juries are not empaneled and sworn to convict. Juries are empaneled and sworn to find the truth," etc.

9. The court did not err in refusing a new trial.

No. 4358. OCTOBER 15, 1924.

Murder. Before Judge Munro. Muscogee superior court. April 19, 1924.

*Richard Terry* and *George C. Palmer,* for plaintiff in error.

*George M. Napier, attorney-general, W. R. Flournoy, solicitor-general, T. R. Gress, assistant attorney-general,* and *Love & Fort,* contra.

HILL, J. Katie Lou Greer was indicted, together with Jeff Davis, for the murder of Sim Marshall by shooting him with a pistol. Katie Lou Greer was tried alone, was convicted with a recommendation to mercy, and was sentenced accordingly. Her motion for new trial being overruled, she excepted. The motion contained the usual general grounds, and by amendment certain special grounds.

1. Ike Marshall, for the State, testified: "I was at the home of the defendant on the night that Sim Marshall was killed. Sim came up there and knocked on the door, and defendant said she did not want him in there because he kept up so much fuss. J. C. came and knocked on the door, and Sim came in behind J. C., and Katie Lou got a piece of wood and run him out. She said she didn't want him in there, and he went on out and went to chunking bricks up against the door, and after a while he got through throwing bricks. When Katie Lou got the wood to run Sim out, Jeff rushed to the trunk to get his pistol, and it wasn't there, and all of us came out of the house after he had thrown the bricks up against the door, and went on down to Will Watson's store and stood around there a little while, and Sim came on back up the road and went on to Watson's store, and we stayed around there and talked in the store, and this boy Jeff walked by the store twice. Sim was just standing up by the counter,

talking. He had not bought any food. I didn't see him eating anything. He stood up against the counter, and after while he said he believed he would go home, and by the time he walked to the door the gun fired; and after the gun fired Jeff hollered, 'I told you I'll get you—I told you that we would get you.' When the gun fired Sim just rushed into the store and fell upon the ice-box and died there. That happened in Muscogee County. Sim did not have anything in his hand when he started out the door. After Katie Lou had shot Sim she came and poked the gun back in the door, and Will Watson run to the door and told her she better not shoot any more." On cross-examination the witness testified: "I do not swear that this is the gun she had that night. She had a single-barrel shotgun. I saw the barrel of the gun. You know I could not see the stock when she had it in her hand. That part there was sticking in the door; that is the barrel of it. . . The moon was shining. I know that, because I saw it. I had eyes to look at it."

C. C. Layfield, for the State, testified: "I am deputy sheriff of Muscogee County, and as such was called to investigate the death of Sim Marshall. I arrested the defendant on trial, and had a conversation with her with reference to the implement used in that homicide. Defendant said that the deceased had been throwing bricks at her house, and she got the gun and went down to that store and shot him. I asked her where the gun was, and I went and got the gun. It was across the street there, about a couple of hundred yards, at another negro's house. I do not know the name. She showed me where the house was, and I do not know whether she called the negro's name or not. In the conversation I had with defendant I did not make any threats or anything of that kind. The admissions or confessions were freely and voluntarily made. I did not hold out any hope of reward or fear of punishment whatever, and there was no inducement in the world offered her to make that admission or confession. I asked her what the trouble was, and she told me about the brick-throwing, and she said that her and this boy went on down to the store; she and Jeff Davis went down to the store, and when he came out she shot him. She said they followed him on down there. The boy was not present when I talked to her at that time. She did not say anything else about any other effort to kill him. She

said she shot him; didn't blame anybody else at all. I told her that I wanted the gun that she shot him with, and she told me it was over yonder at that negro's house. I brought it back to where she was, and she said that was the gun. That store is in Muscogee County. I am not positive, but I think she told me she reloaded it. And where I got the gun—the negro that gave me the gun wanted to know if I wanted the shell. It was loaded when I brought it. . . The gun was loaded when she carried it there, and he asked me if I wanted the shell, and I told him I did not. He unloaded it. I have stepped the distance from Katie Lou's house down to Will's store, and it measured 72 steps. I would say that is about 72 yards." On cross-examination this witness testified: "I asked her what the trouble was about the shooting of Sim. She said she shot him. She said he wanted to come in her house, and she didn't want him and she would not let him in there, and he throwed bricks at the door. That was about all there was to the admission, only she said she went on down the road to the store. I don't know whether Mr. Lamb and Mr. Beard heard her say that or not. She did not say the deceased was doing anything at the time she shot him. She said he wanted to come in there, and she would not let him in, and he throwed bricks at the door."

Henry Washington, for the State, testified: "The defendant brought it [the gun] to my house, and it was loaded. I heard her tell my wife, 'Lord have mercy! I done shot Sim. He was throwing rocks against my door up there, and I shot him.' She said: 'Lord have mercy! I shot Sim. He had been throwing rocks against my door.' That is all I know."

Jeff Davis, for the defendant, testified, on cross-examination: "If Katie Lou got rough and got a stick of wood, I didn't see her. I never went to any trunk and got a pistol. I never opened my mouth to Sim. Didn't anybody run Sim out of the house; some men pushed him out, but I don't know who they were. I think one of them was Bubber Stephens. . . When Sim went out the door nobody went out but him, but that was not because defendant and I were after him. He didn't chunk the brickbats against the door then; he went down the road and came back, and he said he had a shotgun too. Maybe if we had come out he would have shot, but he didn't shoot any gun. We heard two or three brick-

bats hit the door. While he was chunking the brickbats he said he was going to kill the defendant Katie Lou. I don't know what about. After the brickbats stopped he went off, but I don't know where he went. That gun is mine, I got it from Willie Gamble, the boy that stays out at Wynnton. . . The reason that it was at Katie Lou's house was, I had been hunting that Friday evening, and I just carried it on up there. She didn't go off anywhere and get the gun. She didn't try to use the gun while Sim was out there chunking at the house. She was scared to go out there. I didn't get my pistol either. . . I got to Katie Lou's house, carrying the pistol, about six o'clock, and Sim Marshall came there about 11 o'clock. I had been sitting around Katie Lou's with the pistol in my pocket all the time. After Sim went on down the road after he got through throwing bricks, I didn't go nowhere. I didn't go down to the store and walk up before the door there. When Katie Lou left with the gun I didn't hear her say anything. She looked out the door and saw him coming down the road from toward the store. Katie Lou was down the road when she shot, and I was standing on the hill by her house. I wasn't watching her. I was fixing to go home, and she started down to meet Sim. After Sim told her he was going to kill her and was coming back up the road there, she went meeting him with the gun. I wasn't standing out there watching her, for I could not see her. I don't know where she was when she shot him. If she shot him right there in the store door I didn't see her. I didn't see her shoot at the store door. When I heard the gun fire it was between her house and the store. I saw her. I saw defendant when she shot; she was between her house and the store. I don't know how far it was. She was as close to the store, about as far as from here to that corner over yonder. I don't know how far it is. I guess it is about sixty feet. I was standing there where I could see her. I don't remember telling you that I didn't see her. I did see her, but I did not see him. I reckon she was shooting at Sim as she hit him. I could see the store. Maybe I could have seen Sim if he had been there. He is the man that got shot. She didn't shoot but one time. I saw her shoot, and I reckon she shot Sim. They say he is dead. I don't know. I didn't see him. He was not in any store. I didn't see him in any store. At the time the gun fired I could see the store door. I could see the

store door all the time. Immediately before the gun fired, I don't know where Sim came from. If anybody came out of the store I did not see them. A brick did come down the road. Wasn't nobody with it. I don't think it came down by itself. I don't know who was with the brick. She said Sim Marshall is the one that threw the brick at her. When the brick came down the road, then the gun fired right away," etc.

The defendant in her statement said, among other things: "By that time Ike went out, and all of them left; and when all of them left and he [deceased] come back, then I saw him coming, and I just had stepped out the door and I saw him coming, and he got in near about up to my house, he chunked, and I fired, and I broke and run, and he run too. I went one way and he went another. I went up the alleyway and he went back and run in that store down there, and I carried the gun on down to my cousin's, Henry W. Washington. I told him that Sim had been there chunking bricks there up against my house, and he throwed one at me and I fired—I shot him but I didn't know whether I hit him or not, and I went on up to the house where I work at." There was a good deal of other evidence, but the foregoing sets out substantially that of the State which is relied upon for a conviction. We are of the opinion that the evidence for the State is sufficient to authorize the verdict of guilty of murder.

2. Ground one of the amended motion complains that the court committed error on account of certain remarks of the court during the cross-examination of the witness Ike Marshall by counsel for the defense, who propounded the following questions which were answered by the witness as follows: "Q. What were you doing in there? (Meaning in the store where the killing is alleged to have occurred.) A. Just sitting down there. Q. What had you bought? A. Nothing. Q. What had anybody else bought? A. I don't know. I didn't pay any attention to that. Q. You don't say that some of them were eating? A. Some of them were eating." Whereupon at this point in the cross-examination, the court then and there, within the presence and hearing of the jury, directed the following inquiry to counsel for the defendant, who was cross-examining the witness, to wit, "By the court: Why is this injected into the case? By Mr. Fort: It hasn't any relevancy at all. By the court: I dislike to stop lawyers from a line of

reasoning in the course of investigation, but if you will just hit the nail on the head———." Movant contends that the foregoing remark of the court addressed to counsel for the defense, occurring as it did when counsel was endeavoring to test the witness as to what he knew about the case and saw immediately preceding the alleged shooting, was very prejudicial and harmful to the rights of the defendant, because the court assumed that counsel for the defendant had "injected into the case" evidence which did not properly belong in the case, there being no facts which authorized such a conclusion upon the part of the court; it tended to belittle the efforts of counsel for the defense in the mind of the jurors, and impressed them with the idea that there was no merit in the line of cross-examination then being conducted by counsel, whereas it was very material to the defense to show that the witness and others in the storehouse, where the killing is alleged to have occurred, were eating or otherwise engaged, and their attention was not attracted by what the deceased did immediately preceding the shooting, or how long the deceased had been gone from the storehouse before the shooting occurred; said remark by the court prejudiced the defendant's case, and was an expression of opinion by the court that said evidence was of no probative value to the defendant's case, was foreign to the issue on trial, and caused the jurors to lose confidence in counsel and to bring him into contempt and ridicule by the jurors.

We are of the opinion that the above is not ground for reversal. Very great discretion must necessarily be left to the presiding judge in the examination of witnesses; and unless he uses this discretion in violation of some principle of law, a reviewing court can not control the exercise of that discretion unless it is manifestly abused. *Thomasson* v. *State,* 22 *Ga.* 499 (3), 504; *Harris* v. *Central R. Co.,* 78 *Ga.* 525 (3), 533 (3 S. E. 355). See *Alabama Construction Co.* v. *Continental Car Co.,* 131 *Ga.* 365 (3) (62 S. E. 160). We do not think the court abused his discretion in this instance.

3. Error is assigned upon the following charge of the court: "The law presumes every homicide to be malicious until the contrary appears from circumstances of alleviation, excuse, or justification, and it is incumbent upon the defendant to make out such circumstances to the satisfaction of the jury, unless they

appear from the evidence produced against her." It is insisted that this charge is not a correct statement of the law, and that it is misleading and confusing, for the reason that the law does not make it incumbent upon the defendant "to make out such circumstances" of alleviation, excuse, or justification, and that it placed a burden upon the defendant that she was not required to carry under the law. The above charge is in accord with the ruling made in *Mann* v. *State,* 124 *Ga.* 760 (53 S. E. 324, 4 L. R. A. (N. S.) 934); *Hooks* v. *State,* 152 *Ga.* 403 (3), 404 (110 S. E. 300); *Fitzpatrick* v. *State,* 149 *Ga.* 75 (3) (99 S. E. 128); *Chance* v. *State,* 156 *Ga.* 428 (2) (119 S. E. 303).

4. Error is assigned upon the following charge of the court: "Provocation by words, threats, menaces, or contemptuous gestures shall in no case be sufficient to free the person killing from the crime and guilt of murder. That part of the section means that a man can't go and by using provocation to another and threats to another and menaces to another, and if the party kills him on that account, simply on account of passion, that the party killing him would be justifiable. The killing must be the result of that certain violent impulse of passion supposed to be irresistible; for if there should have been an interval between the assault or provocation given and the homicide, in which the jury in all cases shall be the judges, sufficient for the voice of reason and humanity to be heard, the killing shall be attributable to deliberate revenge and be punished as murder." It is insisted that this charge is confusing and misleading, and incorporates into section 65 of the Penal Code of 1910, which the court attempted to give to the jury in charge, language that does not appear therein, and deprives the defendant of the right to act upon a "sudden violent impulse of passion." The charge as given is substantially in the language of Penal Code, § 65, except the use of the word "certain" for "sudden," as used in the code. The use of the word "certain" for "sudden" is manifestly a typographical error; but assuming that the one word was used for the other, they are so nearly idem sonans that the jury could not have been misled by the use of such word. The charge is not open to the objection that it is not authorized by the evidence, as contended, or for any other reason assigned.

5. The fourth ground of the amended motion for new trial

alleges error because the court withheld and excluded from the jury the following evidence of J. A. Beard, a witness for the defense: "Q. Did you go out and investigate this killing, Mr. Sheriff? A. Yes, sir. Q. Just tell the jury what condition you found this here Katie Lou's front yard, and what you saw on the door in reference to any kind of weapons that had been used around there, brick, or anything of that kind. A. Well, about two o'clock at night, I had a telephone message that there had been a killing out there. I went immediately, me and my son-in-law, Mr. Kendrick Kierce, and when I got to the place I found Sim Marshall laying in that little store, dead. I went out to investigate to find out who it was that did the killing. The information I could get from those around there, that they didn't see it, but Katie Lou Greer done the killing. I investigated to find out where Katie Lou lived, to see if I could find her. I found where she lived. I went in the house and searched the house for her. She wasn't there. I went——. Q. (interrupting) Just tell, Mr. Sheriff, what you found around the yard. A. Not that night, I didn't find it that night. I went back the next morning. Q. Go ahead. A. I couldn't find any eye-witnesses at all that saw the shooting. No one would give me any information." While said witness was on the stand and after testifying as above set out, the court at this juncture said, in the presence and hearing of the jury, as follows: "By the court: Mr. Terry [counsel for the defense] suppose you ask him the questions what you want. All of this has got no probative value whatever, in this case." It is contended that the remark and ruling of the court was error and harmful and prejudicial to the plaintiff in error, for the reason that it was material to show by the witness, who was the sheriff of the county and who went to investigate the killing on the night it occurred, all the surrounding circumstances, and that it was pertinent and beneficial to movant's defense to show by the witness that he found no eye-witnesses to the killing and that no one would reveal to him what they knew about the case; that the ruling of the court was prejudicial and harmful to defendant's case, because it impressed the jury with the idea that counsel for the defense was not endeavoring to ascertain the truth, but was merely consuming the time of the court in a useless and irrelevant examination of the witness; and that the remark made by the

court in the presence of the jury tended to discredit defendant's counsel and subject him to the ridicule and contempt of the jury, and chill the testimony delivered by the witness; that plaintiff in error was entitled to have this testimony go to the jury without the stamp of disapproval of the court.

We are of the opinion that the effect of the court's ruling was to rule out the evidence as irrelevant and immaterial, and we are of the opinion that the remark of the court was not objectionable for any of the reasons assigned, and agree with him that the evidence has no probative value and was therefore properly excluded.

6. The court did not err in failing to charge the law of circumstantial evidence, as contained in section 1010 of the Penal Code of 1910. The evidence for the State showed that the defendant made a voluntary admission of the killing; besides, there is direct evidence that the defendant shot the deceased; and it was not necessary to charge on the law of circumstantial evidence. See *Perry* v. *State*, 110 *Ga.* 234 (3) (36 S. E. 781); *Eberhart* v. *State*, 47 *Ga.* 598 (8). Besides, the defendant, in her statement to the jury, admitted the shooting, but sought to justify it.

7. Ground six of the motion for new trial complains that the court failed to charge, that, "in cases of doubt, good character should preponderate in favor of innocence, especially where life is involved; and the evidence of good character alone may be sufficient to generate a reasonable doubt of the defendant's guilt." Movant contends that she introduced evidence of her general good character, and good character for peaceableness, and the failure of the court to charge the jury upon the subject of good character deprived her of one of her substantial defenses; and that as a result of the oversight of the court in this regard the jury failed to consider the evidence offered by her to substantiate her good character. There was no request to charge upon this subject. In *Scott* v. *State*, 137 *Ga.* 337 (73 S. E. 575), this court held: "While the good character of an accused person is a substantive fact, and evidence of such character should be weighed and considered by the jury in connection with all the other evidence in the case, still such good character of the accused is not a distinct substantive defense. A proper instruction should be given in every case where the accused puts his character in issue; but in the absence of a timely request, an omission to give a specific charge on the subject

will not require a new trial. It is only in exceptional cases where the court fails to charge relatively to the good character of the accused that a new trial should be granted. *Seymour* v. *State,* 102 *Ga.* 803 (30 S. E. 263)." The present case falls within the general rule, and not within the exception.

8. Ground seven of the motion for new trial complains that the court erred in charging the jury as follows: "Juries are not empaneled and sworn to acquit." Counsel for movant gave only one sentence of the court's charge in this respect. Taken in its entirety the charge is not open to the criticism made against it. The entire charge on this subject is as follows: "Juries are not empaneled and sworn to convict. Juries are not empaneled and sworn to acquit. Juries are empaneled and sworn to find the truth. In determining where the truth is you look to the defendant's statement, giving it just such weight as you think it should have. You look to the witnesses as they testify on the stand, their manner of testifying, their opportunity for knowing the facts about which they testify, the reasonableness or unreasonableness of their testimony, their prejudice or bias, if any, their intelligence or lack of intelligence, their relationship to the parties, if any," etc.

Considering the entire record, including the entire charge of the court, we are of the opinion that the defendant had a fair and impartial trial. The lower court being satisfied with the verdict, and there being evidence to support it, we do not think he abused his discretion in refusing a new trial.

*Judgment affirmed. All the Justices concur.*