## PIERCE *v.* THE STATE.

1. The evidence in this case was such as to entitle the defendant to have the law on the subject of voluntary manslaughter given in charge to the jury.
2. Even if the evidence authorized a charge on the law of confessions, the failure to instruct the jury on that subject, in the absence of an appropriate written request so to do, was no cause for a new trial.

Argued December 21, 1908.—Decided February 10, 1909.

Indictment for murder. Before Judge Lewis. Greene superior court. November 16, 1908.

*James Davison* and *Miles W. Lewis,* for plaintiff in error.

*John C. Hart, attorney-general,* and *Joseph E. Pottle, solicitor-general,* contra.

HOLDEN, J.  Miles, Allen, and Will Pierce were indicted for the murder of Will Jernigan. Miles and Allen Pierce were jointly tried, and a verdict was rendered finding Allen Pierce not guilty, and Miles Pierce guilty, with recommendation to mercy. The latter made a motion for a new trial, and to the order of the court overruling it he filed exceptions, bringing the case here for review.

Upon the trial of the case, S. O. Swann, the sheriff of Greene county, and a witness for the State, testified, among other things, as follows: "By 'Buster' I mean Miles Pierce; we know him as 'Buster.' He [defendant] said, 'Me and Allen killed him. . . We shot him with a shot gun—I shot him. . . We shot him, and after we shot him we took and carried him over there and buried him where you all carried us this morning. . . After we killed him on Monday morning, we went over there Tuesday night and carried him to the river and throwed him off the bridge in the river. . . Papa told us to kill him.' Will Pierce is their papa. I said, 'What did he want you to kill him for?' He said he didn't know. Then he went on to say the reason he killed him that morning was, his sister had got burned at Union Point, and his mother was down there, and Will Jernigan (the one that is dead) told them they couldn't go to see their sister, where they wanted to go; that they had to go to the field and go to work. Then Buster said that Will got a gun after him, and that he (Buster) ran through the house and got a gun and came out there and killed him. Then we sent back up after Allen, the younger

boy, and said, 'Allen, what about that killing?' He said 'I don't know anything about it.' And Buster spoke up and said, 'You had just as well tell the truth. I have told it.' And he (Allen) then told identically the same tale Buster had told. That was after we found the body in the river. When it was first found, it was thought to be somebody else. Buster said Will Jernigan got the gun and said he was going to kill them both, and he said Will had a single-barrel gun, and Buster got the double-barrel gun and ran around the house and shot him twice. He said that was early Monday morning, and took him and buried him in a pine thicket. . . He never said anything about his stepfather loading his gun, to me. He was by himself when he told me all that. When they brought the little boy down there he told it like Buster did. The little boy said Buster done the shooting. Buster took it on himself, and Allen came and agreed to the same thing. . . When I first had this talk with Buster down at Mr. Lewis's, there was something said about Jernigan shooting at him. It was down there at Mr. Lewis's he said his father told him to do it. He said the old man told him to kill him, and I said, 'Why did you do it?' and he went on to tell me. I think he said afterwards his Pa told him if he abused him and his mother to kill him. I asked him if his father was there, and he said he was not. Will Pierce is the father of these boys, and their mother, Lila, got a divorce from Will Pierce and married Will Jernigan."

E. L. Lewis, a witness for the defendant, testified as follows, in reference to statements made to him by the defendant: "He said they had asked cousin Willie Jernigan to go to see their sister, and that Will cursed him and Will got his gun, and he (Buster) ran out of the door. As he expressed it, he dodged behind the door jamb just as Will Jernigan shot, and that he (Buster) ran in the room and looked up over the window and got two shells, and that he hopped out of the window and ran out in the yard to the right, and that Will faced him and breeched his gun; that he had reloaded it as he supposed, and that then he shot twice, and that he then called Allen up there and told him he had killed Will, and that they then disposed of his body. He said the little boy was out towards the spring when the shooting occurred. He said the little boy ran, and that he (Buster) got towards the lane and shot just as Will had reloaded his gun. . . He said he

jumped out of the window and ran out, and that Will came down this doorstep (indicating D on diagram) and he shot him. He said Will was reloading his gun when he (Buster) shot—he afterwards said he had breeched it back."

The defendant Miles Pierce said, in his statement: "And time I turned to go in the shed-room he shot by my back, and I grabbed a gun and grabbed two shells over the window, and time I grabbed them he run in the room on me, and I hopped out of the window with the gun, and he turned and went out of the door. I heard him get off the steps on the ground. Then I shot him twice and I went back to the steps and set down and called Son, and told him I had killed Cousin Willie; and we hitched up and put him in the wagon and carried him down there and dug a hole and put him in it." The defendant Allen Pierce said in his statement: "He said he [Will Pierce] had been trying to get us to kill him nearly ever since we had been with him—and cursed; and I went out of doors and started to crying. I said I wish I could go to see sister, and about that time he grabbed the gun and told brother to leave before he killed us. And I went towards the spring, and he shot, and I saw brother go in the room, and he [the deceased] run back out of doors, and he got out there, and brother had done got out of the window and shot him."

1. One of the grounds of the motion for a new trial was as follows: "Defendant should be granted a new trial, because the court erred in failing to charge the jury the law of voluntary manslaughter as set forth in the criminal code, secs, 64 and 65, and in failing to instruct the jury that they could find a lesser verdict than murder. Said failure to charge was error, because the evidence for the State, to wit, of witness Swann, as well as the defendant's statement, is open to the conclusion that defendant shot deceased immediately after deceased had shot at him, yet when defendant was in no such danger of his life as made it necessary to take the life of the deceased to save his own." The State relied for a conviction upon the conduct of the accused after the killing and on the other circumstances developed in the case, and also upon the testimony of witnesses relating statements made by the defendant as to the circumstances under which the killing occurred. It appears from some of the statements made by the defendant Miles Pierce, known as "Buster" Pierce, to these wit-

nesses that the deceased shot at the defendant in the house, the defendant dodging around the door jamb just as the deceased shot. He immediately ran into a room, obtained a gun and two shells, got out of a window, ran around the house and shot the deceased after he had come out of the house. The testimony of Mr. Lewis is that the defendant said that the "deceased faced him and breeched his gun—that he had reloaded it as he supposed; and that then he [defendant] shot twice . . just as Will had reloaded his gun. . . He said he jumped out of the window and ran out, and that Will came down this door step and he shot him. He said Will was reloading his gun when he (Buster) shot—he afterwards said he had breeched it back." Mr. Swann, a witness for the State, in relating what the defendant told him, said: "He never said anything about his stepfather [deceased] loading his gun, to me."

If at the time of the killing the circumstances were sufficient to excite the fears of a reasonable man that the deceased was intending or endeavoring, by violence or surprise, to commit a felony on the defendant, and the defendant really acted under the influence of such fears and not in a spirit of revenge in killing the deceased, the killing would be justifiable homicide and the defendant would be guilty of no offense. If the circumstances were not such as to excite such fears, or if the defendant did not really act under the influence of such fears in killing the deceased, he would be guilty of some offense. This offense would be murder if the killing was done with malice; but would be voluntary manslaughter if done without malice and in the heat of passion engendered by the previous shooting by the deceased at the defendant and the other circumstances connected with the occurrence. In view of the testimony of the witness Swann, in connection with the other testimony in the case, we think one of the questions which should have been submitted to the jury was whether or not the defendant, in killing the deceased, if not justified in doing so, killed him in the heat of passion and not with malice. If the killing was not justifiable and the defendant killed the deceased without malice, but in the heat of passion caused by the previous shooting by the deceased at the defendant, he would be guilty of voluntary manslaughter. In the case of *Evans* v. *State,* 33 *Ga.* 4, it was held: "Even immediately after an assault endangering

life or limb, the killing of an assailant by the assailed will be manslaughter, if it be apparent that the assault, and with it the personal danger of the assailed, has ended, and that the mortal wound was inflicted as the assailant had ceased from the attempt, and was retreating." Also, in this connection, see *Russell* v. *State*, 88 *Ga.* 297 (14 S. E. 583), and *Smith* v. *State*, 118 *Ga.* 61 (44 S. E. 817) If at the time of the killing the circumstances were not sufficient to excite the fears of a reasonable man that the deceased was endeavoring or intending, by violence or surprise, to commit a felony on the defendant; or if the defendant did not really act under the influence of such fears in killing the deceased, but killed him without malice and in the heat of passion engendered by the previous shooting by the deceased at the defendant and the other circumstances connected with the occurrence, the killing would be voluntary manslaughter; and we think this theory of the case should have been submitted to the jury, and that the failure to do so requires a new trial.

2. Complaint is made that the court failed to charge upon the subject of confessions. It does not appear that any written request was made for a charge upon confessions to be given the jury. If the evidence authorizes a charge upon the subject of confessions, it is proper for the court to give such charge, but his failure to do so is not error requiring a new trial, when no written request is made for such charge to be given. *Nail* v. *State*, 125 *Ga.* 234 (54 S. E. 145). *Judgment reversed. All the Justices concur.*