### RANTLEY *v.* THE STATE.

HINES, J. 1. The court did not err in instructing the jury upon the subject of malice, as is set out in the first and second grounds of the defendant's amendment to his motion for new trial; the error assigned being, not that these instructions were incorrect, but that the State had failed to prove facts showing malice, there being ample evidence to authorize and require these instructions.

2. Nor were the instructions set out in the third ground of this amendment erroneous on the alleged ground that the court did not leave to the jury the question of cooling time; the court, in this ground, dealing with the right of a son to defend his mother, and his right to defend her after the danger had passed, and having, in his charge on manslaughter, expressly informed the jury that they were the judges of what was sufficient cooling time.

3. Nor did the court err in omitting to give in charge to the jury, in the absence of a timely written request, section 1031 of the Penal Code of 1910, on the subject of the caution with which confessions of guilt should be received, and of the need of corroborating evidence to convict upon a confession alone. *Malone* v. *State,* 77 *Ga.* 767; *Sellers* v. *State,* 99 *Ga.* 212 (25 S. E. 178); *Walker* v. *State,* 118 *Ga.* 34 (44 S. E. 850); *Patterson* v. *State,* 124 *Ga.* 408 (52 S. E. 534); *Pierce* v. *State,* 132 *Ga.* 27 (63 S. E. 792); *Roberson* v. *State,* 135 *Ga.* 654 (70 S. E. 175). In *Lucas* v. *State,* 110 *Ga.* 756 (4) (36 S. E. 87), the court charged upon confessions, but omitted all reference to the need of cor-

roborating evidence; and in that respect that case is different from the case at bar. Having undertaken to charge on that subject, the instruction should have been full and complete. Besides, in that case no mention is made of the earlier cases of *Malone* v. *State*, 77 *Ga.* 767, and *Sellers* v. *State*, supra.

4. Nor did the court err in omitting to charge on the effect of proof of the good character of the defendant, in the absence of proper request. *Scott* v. *State*, 137 *Ga.* 337 (3) (73 S. E. 575); *McLendon* v. *State*, 7 *Ga. App.* 687 (67 S. E. 846).

5. Nor did the court err in omitting to charge, with or without request, on the sufficiency of circumstantial evidence to authorize a conviction; the State having proved a positive confession of guilt. *Eberhart* v. *State*, 47 *Ga.* 598; *Perry* v. *State*, 110 *Ga.* 234, 238 (36 S. E. 781); *Griner* v. *State*, 121 *Ga.* 614 (49 S. E. 700); *Smith* v. *State*, 125 *Ga.* 296, 299 (54 S. E. 127); *Thomas* v. *State*, 18 *Ga. App.* 101 (88 S. E. 917).

6. Nor did the court commit error, in the absence of a proper request, in omitting to charge the jury that they were judges of the law and facts. *Jones* v. *State*, 136 *Ga.* 157 (71 S. E. 6).

7. The evidence was sufficient to authorize the verdict.

*Judgment affirmed. All the Justices concur, except Gilbert, J., absent.*

No. 3286. August 17, 1922.

Indictment for murder. Before Judge Eve. Turner superior court. May 27, 1922.

James Brantley was indicted for the murder of his father. On the morning of the homicide he went to a neighbor's house and told the latter that his father said, send him two shells. When asked what his father wanted them for, he said his daddy wanted to kill a rabbit in the woodpile. This was about 9 o'clock in the morning. He did not get any shells at this neighbor's. Shortly afterwards a gun was heard to fire. Within a few minutes neighbors went to the home of the deceased, who was found shot and lying on the porch of his house. He was shot in the left side, and the hole was as big as the crown of a hat. He was in great misery, and died in thirty minutes. When these neighbors reached the scene the defendant was sitting on the woodpile. The deceased was shot from his head down with small shot, and one shot in his left shoulder. There was a difference in the wounds. One seemed to be made with scattering birdshot about medium size, and shot from a gun some distance away. The other seemed to be made with a shotgun at very close range, or with a cut shell, making a big hole and shooting the arm in two. The defendant said he for one shot his father. When asked who shot him the deceased replied they shot him. After being pressed to tell who they were, he finally said the boys, as one witness remembered.

The defendant made a free and voluntary statement to the deputy sheriff, who arrested him, in which he stated he shot the deceased. He said both of them shot him. They said each shot him once, and that was all the shells they had. The defendant said he had a single-barrel shotgun and the other brother had a double-barrel shotgun. They stated to this officer the position in which the deceased was standing at the time he fired, and said that they had been getting the hogs out of the field that morning, and when they came back to the house it was about nine o'clock and they were eating breakfast, when their mother came in crying, and they asked her what she was crying about, and she said, "Your father beat me this morning," and the defendant said he had "bored up his last time," and "let's kill," and they got their guns. The deceased was out at the barn by the haystack, and they went there where he was, and the biggest one (the defendant) said to him, "Old man, we are going to kill you this morning, You beat our mother your last time." The deceased wheeled around and ran, and when he ran the defendant shot him, being pretty close to him, and the deceased jumped over the fence, and started back to the house, and the little one (the other brother of defendant) said he ran to cut him off, and ran up to the fence and shot at him, and the deceased ran into the house. Blood was found on the bed in the room into which the deceased went. The deceased then went out of the house and went under the house. The defendant said, after he shot the deceased he went over to a neighbor's house to try to borrow some shells to finish killing him. He said he wanted to do a good job. This officer testified that he believed David (the younger brother) fired the second shot. David said he thought he was going to the branch, and he got to the barn before him, and he ran around the barn to cut the deceased off, and the old man wheeled and went up the lane to the home, and he was a good ways from deceased when he shot him. He said when he shot the old man he was in the gate. The mother had a rag around her head when the neighbors reached the home, but there were no signs of blood on her.

The defendant stated that on the morning of the homicide his father got mad with his mother about something. The deceased beat and knocked her down two or three times, knocked her

speechless and unconscious, and killed her for a few minutes. He was beating her unmercifully, and had done this several times before. He tried to get the deceased to stop, and he wouldn't stop. He ran in the house after the gun. By that time the deceased had gone out, picked his mother off the ground and carried her in the house, and laid her on the bed. Defendant met the deceased in the door as he came out, and shot him. Before defendant shot his father he begged him to stop beating his mother, and he would not do it. It looked like he was trying to kill her, and he could not stand to see his mother done that way, and he shot his father to prevent him from killing his mother. The deceased had been threatening his mother's life, and saying he was going to kill her. That morning when he got up it looked like the deceased started to try to do it. He hit her across her head with a stick, and broke and sprained her arm, and she could not use it for two or three weeks after that, and he just could not stand to see the way he was treating his mother, beating her, and he did not mean to kill his father. He loved his papa and mama both, and he just shot his father to try and prevent him from killing his mother.

A witness for the State testified that he had known the defendant nearly all his life, ever since he was nothing but a kid, and he always seemed to be a quiet boy. In rebuttal of the defendant's statement, A. L. Geoghagan, a witness for the State, testified that he talked with the defendant about the shooting. He told this witness he had shot his daddy. He said that his father was out by a peach-tree when he shot him. There was a peach-tree outside the house about forty or fifty steps from the haystack, but it was closer to the house. The defendant said that his father had been beating his mother, and that he was going to stop it. He said that his father had beat her a little bit, that he had been out for an hour or two, and his father had beat her when he was gone. He said that his father knocked her down the steps. He said after he shot the old man one of them went to get some shells.

The jury found the defendant guilty, with recommendation. He moved for a new trial on the formal grounds, and at the hearing amended the motion. The grounds of the amendment were: (1) Because the court erred in charging the jury as follows:

" Express malice is that deliberate intention unlawfully to take away the life of a fellow creature, which is manifested by external circumstances capable of proof. Malice shall be implied where no considerable provocation appears, and where all the circumstances of the killing show an abandoned and malignant heart," the error assigned being that no malice was proved. (2) Because the court erred in charging the jury as follows: " The legal sense of the term ' malice ' is not confined to particular animosities to the deceased, but extends to an evil design in general. Generally speaking, legal malice is the intent to take human life in cases where the law neither mitigates nor justifies the killing. Legal malice is not necessarily ill will or hatred, in the usual and ordinary sense in which those terms are employed. 'It is an unlawful intention to kill, without justification or mitigation of any character; it is the deliberate wilful intent unlawfully to take away human life, whether it springs from ill will, hatred, revenge, or any other unlawful motive; malice must have existed at the time of the killing; it need not have existed any length of time previously," the error assigned being that no legal malice was shown. (3) Because the court erred in charging the jury as follows: " Of course, gentlemen, you understand that under the rules of law prevailing in this State a son will have a right to defend and protect his mother in the event her life is about to be taken or a felony is about to be committed on her person, or if under the circumstances as a reasonable man the defendant was justified in believing her life was about to be taken or that a felony was about to be committed on her person; still, if the danger has terminated and the occasion has passed, if the occasion has passed, even though an assault has been committed on the person of his mother, or an assault and battery or an effort made to inflict any other kind of personal injury, if the danger has passed and the occasion has gone and there was no impending danger, then, of course, an accused person would not be authorized to take the law into his own hands as a matter of revenge and slay the wrong-doer. Under such circumstances a defendant would not be justified in taking the life of the wrong-doer; and the offense of which he would be guilty would be either murder or voluntary manslaughter, as determined by the jury from a consideration of all of the evidence. As before explained to you an

unlawful, intentional killing without malice expressed or implied, but in a sudden heat of passion, would be voluntary manslaughter; and an unlawful killing with malice aforethought, expressed or implied, would be murder; the grade of the offense, of course, if an offense has been committed, to be determined by the jury from a consideration of the evidence and the principles of law given in charge;" the error assigned being that the court did not leave to the jury to say what cooling time was in the case, cooling time being always a question for the jury; but the court assumed that the defendant had cooling time. (4) Because the court erred in failing to charge the jury as follows: " All admissions should be scanned with care, and all confessions of guilt should be received with great caution. A confession alone, uncorroborated by other evidence, will not justify a conviction." (5) Because the court committed error in not charging the jury on the good character of the defendant, he having put his character in issue for peaceableness through testimony of the State's witness, who declared that he had never heard of anything against him at all until this happened; this being the highest character a man can prove for peaceableness and the best. (6) Because the court omitted to charge the jury as follows: " To warrant a conviction on circumstantial evidence the proved facts must not only be consistent with the hypothesis of guilt, but must exclude every reasonable hypothesis save that of the guilt of the accused;" the error assigned being that the State relied solely for conviction on circumstantial evidence. (7) Because the court erred in not charging the jury as follows: " On the trial of all criminal cases the jury shall be the judge of the law and the facts, and shall give a general verdict of guilty or not guilty;" the error assigned being that in criminal cases juries are the judges of the law and the facts in the case, taking the law from the court and the facts from the witnesses sworn.

The court overruled the motion for new trial, and error was assigned on this judgment.

*John R. Cooper* and *W. O. Cooper, Jr.,* for plaintiff in error.

*George M. Napier, attorney-general, R. S. Foy, solicitor-general,* and *Seward M. Smith, assistant attorney-general,* contra.