WHITAKER *vs.* THE STATE OF GEORGIA.

1. Where several persons were indicted jointly, and upon the trial of one of them, another was examined as a witness for him, it was admissible for the attorney for the State to lay the foundation for impeaching such witness by inquiring as to the making of statements contradictory to his testimony, such evidence being introduced and used solely for the purpose of impeaching the witness.
2. Evidence showing a difficulty between the defendant and another person shortly before that between the defendant and the deceased, was inadmissible, in the absence of proof tending to show any understanding or combination between the deceased and his party and such other person.
3. It is for the court to determine whether the foundation for the admission of statements as dying declarations has been laid; and where it did not appear that the declarant was conscious that he was in the article of death at the time the declarations were made, but only that he said that he was shot and might get over it or might not; that he did not think he could ever get over it; that he might live, but it was a doubtful case: this was not a sufficient

foundation to admit his statements in evidence as dying declarations.

(a) Declarations made to a witness, and shown to have been made while the deceased was conscious that he was *in articulo mortis,* were admitted in evidence; but this testimony threw no light on the question of his consciousness of his condition at the time when he made declarations to other persons not then present.

4. There was nothing in the evidence in this case to authorize a charge on the subject of voluntary manslaughter, even if the court had been requested so to charge; nor was there anything involving principles announced in §§4344, 4345 of the code, relating to other instances which stand upon the same footing of reason and justice as those enumerated, which will justify a homicide.

5. The verdict was sustained by the evidence.

March 25, 1887.

Criminal Law. Evidence. Dying Declarations. Witness. Before Judge MARSHALL J. CLARKE. Fulton Superior Court. September Term, 1886.

Reported in the decision.

GARTRELL & LADSON, for plaintiff in error.

C. D. HILL, solicitor-general, for the State.

HALL, Justice.

Asa Whitaker was indicted jointly with Chapman Scott, Evans Harris and Jim Sheely, for the murder of William Drakeford, and being found, on his trial, guilty of voluntary manslaughter, he made a motion for new trial, which was overruled; and thereupon he excepted and brought the case to this court. The first four grounds of the motion are the usual grounds, that the verdict is contrary to the evidence, etc. The amended motion contains the special grounds, which are:

(1) That the court erred in rejecting testimony as to a difficulty between the defendant and Frank Robinson, which occurred a short time before the shooting of McDonald, the uncle of the deceased, William Drakeford. This

testimony was rejected because it did not appear that the deceased was present at the occurrence, or that it had any connection, immediate or remote, with the shooting of Drakeford by the defendant, the defendant's attorney stating, when called upon, that he did not expect to show that Drakeford entered into any combination with Robinson to attack the defendant. Defendant's counsel insisted that, although the transaction preceded the difficulty with McDonald and his party, including Drakeford, it was part of the *res gestæ;* that the testimony was relevant to show the peaceable disposition of the defendant, and to show the circumstances under which the defendant left the house, and the intentions with which he left; and that it was admissible to rebut the idea that there was a conspiracy between the defendant and the others, three of whom were jointly indicted with him; and also to show the reasonableness of the fears under which the defendant acted.

(2) Because the court erred in admitting, over defendant's objection, testimony of his co-defendant, Scott, as to his conversation with another defendant, Harris, while they were confined in the guard-house. This examination was had, as the court certifies, for the purpose of laying the foundation to impeach this witness, and was admitted for that purpose and that purpose only.

(3) Because the court erred in ruling out the dying declarations of Drakeford.

(4) Because there was error in failing to charge the jury as to the law of involuntary manslaughter, and in not giving them in charge sections 4334, 4335 of the code, viz. that all other instances which stand upon the same footing of reason and justice as those enumerated, shall be justifiable homicide ; and that the homicide appearing to be justifiable, the person indicted shall, upon the trial, be fully acquitted and discharged.

The case made by the evidence was briefly this : On the night of the 24th of December, 1885, an entertainment was given by Bomar, at a house on Martin street,

in the city of Atlanta, to what was known as the "Nickel Club." The defendant and his party did not belong to this club, and went to the entertainment without any invitation, either from Bomar or any member of the club. They assembled in the street outside of the house, and conducted themselves in a somewhat riotous and disorderly manner. One of the windows of the room in which the guests were assembled, was broken by a stone thrown against it, which greatly alarmed the women. Shortly before this, the defendant had entered the house, where he got into an altercation and fight with Frank Robinson. Drakeford was not present at this fight. Shortly after it occurred, the defendant was requested by Bomar to leave the house, and did so, joining his party in the street. Afterwards, McDonald and others belonging to the club came from the house to the street, where some altercation took place, when the defendant procured a pistol from Scott and shot McDonald, giving him a wound in the face. Thereupon the friends of McDonald rallied and made pursuit, with a view, as they alleged, to arrest the defendant for the shooting of McDonald. The defendant turned upon his pursuers, and shot Drakeford, giving him a wound from which he died a day or two afterwards. After this occurrence he fled, and some six months after his flight, he was arrested in Jacksonville, Florida, and brought back to Atlanta to answer for this offence. His co-defendants, Scott and Harris, were arrested on the morning after the difficulty, and lodged in the city barracks, in different cells. Scott was sworn, and testified on the trial of the defendant as one of his witnesses. The evidence he gave was in favor of the defendant; and the State propounded questions to him with a view to lay the foundation of impeaching his evidence, by showing that he elsewhere, to-wit, while he was confined in the barracks, made statements directly in conflict with the testimony which he gave on the trial. The questions propounded to him by the State were allowed for this purpose, and this purpose only; and

this brings us to a consideration of the second special ground of the motion for new trial.

1. At an early period in the history of this court, it was held that where a party seeks to impeach the testimony of a witness, on the ground that he has made contradictory statements, it is incumbent on him to announce, when so required, the statement he seeks to contradict, that the court may judge of its materiality. The testimony offered avowedly to impeach the credit of a witness by showing contradictory statements, cannot, in the argument before the jury, be used for a wholly different purpose. *Williams et al. vs. Chapman*, 7 *Ga.* 467. The authority of this case has been frequently recognized and acted upon in subsequent rulings of this court. It is only necessary to remark that the witness was subsequently impeached by proving contradictory statements at the time and place alleged in the foundation laid to impeach him. There was no question as to the materiality of the evidence sought to be impeached; and it does not appear that it was used on the trial for any other purpose or in any other manner than that for which it was avowedly offered, viz. to impeach the witness and destroy his credit.

2. In the absence of proof tending to show an understanding between the deceased and his party and Robinson, in relation to an assault upon the prisoner, and the deceased being absent at the time, evidence of what occurred between Robinson and the prisoner was inadmissible, and was properly rejected by the court.

3. It does not appear from the testimony of Lula Collier or Waterloo Bullock, who were the witnesses offered to prove dying declarations of the deceased, that at the time the alleged declarations were made, the declarant was conscious that he was in the article of death. That essential fact, their statement leaves altogether in doubt. That is certainly the condition upon which such declarations are to be admitted. Code, §3781, and citations. *Mitchell's* case, 71 *Ga.* 128, 141. The court is to determine

whether the foundation for such evidence has been laid; and according to the testimony in this case, we think he could have reached no other conclusion than he did. To the first of these witnesses, the deceased said, " Well, I am shot; I may get over it, and I may not "; "but it seemed," said the witness, "from the way he spoke, that he must have thought he was going to die." The other witness, Waterloo Bullock, was not more certain as to the consciousness of the dying man of his condition than was the former. To this witness he said, " I may die; I do not think I will ever get over this. I may live, but it is a doubtful case."*

All the preceding cases are reviewed in *Mitchell's* case, and we do not think that it will appear from any of them that the dying declarations have been admitted, unless the testimony showed that the person making them was conscious of his condition and believed he was in the article of death. In this case it is very far from appearing that he had such consciousness. The statements made by the dying man to Gifford, between four and five o'clock on the evening previous to his death, were admitted as dying declarations. He said, "I am going to die; I cannot live." The witness replied, "Pshaw, you won't; you won't die; you are not seriously hurt." "Yes," he said, "I cannot live." The dying declarations thus given in evidence related strictly to the cause of his death, and to the persons who inflicted the fatal wound. Neither of the other witnesses were present at this time, and this testimony throws no light as to his consciousness of his condition at the time it is claimed he made declarations to them.

4. There was nothing in the evidence which would authorize a charge upon the subject of involuntary man-

*These witnesses testified that they visited Drakeford on the afternoon before he died, and were there between four and five o'clock; and after seeking to lay the foundation for the admission of dying declarations, the witness, Lula Collier, offered to testify to a long conversation between her and Drakeford as to the difficulty, where it began, that he had nothing to do with it, that his un le was shot and he was running after the man, etc. This was excluded.

slaughter, even had the attention of the court been called to it and he had been requested to give such a charge; nor was there anything in the evidence involving principles announced in sections 4334–5 of the code (which relate simply to other instances which stand upon the same footing of reason and justice as those enumerated), which will justify the homicide.

5. There is nothing in the general grounds of the motion. The evidence fully sustained the verdict, if indeed it would not have sustained one finding the defendant guilty of a higher offence.

Judgment affirmed.