## NORTON v. THE STATE.

1. After a juror had answered on his voir dire the prescribed questions, counsel for the accused was permitted to question him further. He was asked, "Is your mind perfectly impartial between the State and the accused; do you think you are strictly impartial?" To this he answered: "Well, I don't know that I am." On further examination he stated: that he was in a position to pass fairly upon the guilt or innocence of the accused; that he believed he could give a fair and impartial verdict, after hearing the evidence; that he had no opinion so fixed and unalterable as not to yield to the evidence; that he had not seen the crime committed or heard any of the evidence; that he had no prejudice or bias for or against the accused, and had no feeling against him. When asked in regard to his answer to a previous question, that he did not know that he was strictly impartial, he explained it by saying that he did not think he so answered; that he did not hear very well, and might have misunderstood the question. *Held*, that there was no error in ruling that the juror was competent. *Cato* v. *State*, 72 *Ga.* 747.

2. It was not accurate to charge: "If you should believe to a reasonable and moral certainty, from all the circumstances and facts, in connection with the defendant's statement, that the defendant was acting in self-defense, or in defense of his person against one who manifestly intended by violence or surprise to commit a felony on his person, then under the law he would be justifiable." But, when considered in connection with the general charge on the subject of the presumption in favor of the accused and the necessity to prove him guilty beyond a reasonable doubt, the charge quoted does not require a reversal.

3. One upon whom an arrest unlawfully and without a warrant is attempted to be made has a right to resist force with force proportionate to that being used in detaining him. The mere fact of unlawful arrest will not alone authorize the killing of the officer making it. But if, in the progress of the transaction, the officer is about to commit a felony upon the other party, or so acts and makes such a show of violence as to excite in the person sought to be arrested the fears of a reasonable man that a felony is about to be committed upon him, and such person acts under the influence of those fears and not in a spirit of revenge, he may protect himself, although it may be necessary to slay the officer for that purpose. In some cases, where the circumstances are not such as to justify the killing of the officer, they may be sufficient to reduce the homicide from murder to manslaughter. *Franklin* v. *Amerson*, 118 *Ga.* 860, 863 (45 S. E. 698); *Thomas* v. *State*, 91 *Ga.* 204 (18 S. E. 305); *Perdue* v. *State*, 135 *Ga.* 277, 284 (69 S. E. 184); *Porter* v. *State*, 124 *Ga.* 297 (52 S. E. 283, 2 L. R. A. (N. S.) 730).

(a) In the light of the evidence showing an unlawful killing by a deputy sheriff, who did not even inform the person whom he shot of his official position or of any purpose to make an arrest, before shooting, and in view of the general charge, the charge touching resisting an illegal arrest, of which complaint is made, while not altogether accurate, does not require a new trial.

4. If one intentionally shoots another with a pistol, and the person shot

dies from the wound, this presents no theory of involuntary manslaughter because the slayer, in his unsworn statement upon the trial, asserts that he intended to wound the decedent, but not to kill him. *Stovall* v. *State*, 106 *Ga.* 443 (32 S. E. 586) ; *Scott* v. *State*, 132 *Ga.* 357 (64 S. E. 272) ; *Perdue* v. *State*, 135 *Ga.* 277 (69 S. E. 184).

5. The evidence in this case did not raise any issue of fact requiring a charge on the subject of either voluntary or involuntary manslaughter.

(a) The statement of the accused set up justification. Had it furnished any basis to charge on the subject of voluntary manslaughter, no request was made for such a charge.

6. Where, after the judge had completed his charge to the jury, counsel for the accused moved the court to declare a mistrial on the ground that one of the jurors was not impartial, and offered to introduce evidence to that effect, there was no error in calling the juror from the jury room and allowing him to be sworn by the State as to his impartiality, the court sending by the bailiff an instruction to the jury not to consider the case until the juror returned, and the juror, after being examined, having been sent back to the jury room with direction not to disclose to the jury what had transpired.

(a) It appears from a note of the presiding judge that no objection was made to the temporary withdrawal from the jury of the juror whose impartiality was attacked.

7. Under the evidence introduced, there was no error in refusing to grant a new trial on the ground that one of the jurors was prejudiced against the accused and had made statements indicating such partiality.

8. In the light of the entire charge of the court and of the evidence, none of the other grounds of the motion for a new trial were such as to require a reversal. The verdict was fully supported by the evidence.

MARCH 14, 1912. REHEARING DENIED APRIL 12, 1912.

Indictment for murder. Before Judge J. B. Park. Jones superior court. December 26, 1911.

*R. L. Berner, J. B. Jackson, W. A. McClellan, Jack Brown,* and *J. P. Knight,* for plaintiff in error.

*T. S. Felder, attorney-general,* and *J. E. Pottle, solicitor-general,* contra.

LUMPKIN, J. W. B. Norton was indicted for the murder of R. V. Smith. There was evidence tending to show the following among other facts: On November 10, 1910, the sheriff of Bibb county received a telephone message from a man who lived in the country, stating that some negroes had shot at his child or children, and requesting that officers be sent to arrest them. The person making the request also provided an automobile in order to overtake the negroes, who were in a wagon. Norton was a deputy sheriff. He was high tempered. On that day he had been drinking, and was under the influence of liquor. One witness testified that the accused told

him that he had drunk half a pint of liquor. Another witness testified that the accused had taken eight drinks of whisky that day. The sheriff directed the accused and two other deputies to go to the place whence the complaint came, and, if they ascertained that one of the boys had been shot (at another time he testified that he said "shot at"), to keep on until they caught the negro, but if they ascertained that nobody had been shot, and the negroes were only shooting on the highway, to stop when they got to the Bibb county line and get a warrant. After taking the boy and his father into the automobile with them, they went in the direction taken by the wagon. They passed several wagons before the boy could identify any of the occupants. Finally he identified a wagon as the one from which the shooting had been done. The officers arrested the negroes who were in it. The accused fired his pistol into the body of the wagon and hit one of the negroes in the foot or leg. It was then dark. Another wagon had stopped temporarily a short distance ahead, in which was Smith. Either on his own motion or on the suggestion of another member of the party, the accused left the other officers and in company with the boy and the chauffeur got into the automobile for the purpose of pursuing the other wagon. It started and went over a hill. Accused gave chase, and fired his pistol twice in the air. One of the negroes who had been arrested testified that he told the accused that Mr. Smith was in the wagon in front. On this subject the evidence was conflicting. After being chased for some distance by the automobile, outside the limits of Bibb county, and in Jones county, Smith turned out of the main road into a smaller road. The chauffeur stated that it was too rough to follow in the automobile. The accused leaped from it and pursued the wagon on foot, overtaking it a short distance away. When he was not far from it, Smith stopped. The accused called to him to throw up his hands, and again to take his hands from his hip or pocket and to hold them up. Smith said that he had not done anything and was not going to hold up his hands. Thereupon the accused shot him, wounding him in the thigh, as a result of which death ensued. After Smith had been carried to the place where the other officers were, there was some testimony that the accused said he had shot another negro; but another member of the party threw a flashlight upon the wounded man and stated that he was a white man. There was no evidence that the accused in-

formed Smith of his official character, or that he was seeking to arrest him for any offense, or claimed him to be a violator of law. He introduced evidence tending to show that it was so dark that it could not be told whether the man in the wagon which he pursued was a white man or a negro.

In his statement the accused claimed, that, when the wagon stopped, the occupant threw his hand to his hip pocket; that the accused told him to come up there and they would talk it over, which was refused; that the accused told the man in the wagon to move his hand and that the accused would go down there and talk it over, which was refused; that the man in the wagon brought his hand forward with something in it, which the accused could not distinguish in the dark, and he shot at the man's hand, not intending to kill him, but to disable him; and that he picked up a pistol where the man had dropped it. A witness for the defense testified that he heard the conversation as stated by the accused. There was evidence to the effect that Smith was unarmed. After the homicide, the accused left the State and remained away for several months, when he returned voluntarily and surrendered. He explained this on the ground of bad health, and that he did not want to lie in jail. There was much other evidence which need not be stated. It was ample to authorize the conviction. A good deal of testimony on behalf of the defendant was to the purport that it was too dark to tell whether the man in the wagon was a white man or a negro, and in his statement the accused said that he did not know that it was a white man he had shot until so informed by another deputy. But the homicide was unlawful, regardless of the color of the person slain.

The headnotes sufficiently explain the rulings made. Grounds of the motion not specifically mentioned were of such a character as to require neither the grant of a new trial nor an extended discussion. In one or two of the charges complained of, there may have been some slight inaccuracy. On the subject of the right to resist an unlawful arrest, and to kill the person seeking to make it, if necessary, the language of the court was not entirely free from criticism. But, under the facts above stated, and in the light of the entire charge, we do not think that this should furnish any ground for reversal. *Judgment affirmed. All the Justices concur.*