### HARRIS *v.* THE STATE.

1. "Dying declarations, made by any person in the article of death, who is conscious of his condition, as to the cause of his death and the person who killed him, are admissible in evidence in a prosecution for the homicide."
2. On the trial of one charged with murder, as being the accomplice of the one who fired the fatal shot, it was not error to allow in evidence the dying declarations of the deceased against the defendant on trial, that "He [the deceased] said that old Pity [the defendant] sent for him to go down there on Wednesday, and he couldn't go, and she sent back up there Friday for him to be sure to come that night." "This old negro told me that this woman had sent him word by her children to come up there," when taken in connection with other portions of the dying declaration which was admitted in evidence, "that he [deceased] did go, and when he went down there he told her [the defendant] he was there and wanted to know what she wanted, and she told him to come in and he would see what she wanted, and he walked in, and he said Chris shot him." Such dying declarations are admissible.
3. The evidence did not authorize a charge on the law of voluntary manslaughter, and the court did not err in failing to instruct the jury on that subject.

NOVEMBER 11, 1914.

Indictment for murder. Before Judge Walker. Wilkes superior court. May 30, 1914.

*G. A. Green* and *Colley & Colley,* for plaintiff in error.

*Warren Grice, attorney-general,* and *R. C. Norman, solicitor-general,* contra.

HILL, J. Martha, alias Pity, Harris was indicted for murder. On the trial a verdict was rendered finding the defendant guilty and recommending her to the mercy of the court, and she was sentenced to life imprisonment in the penitentiary. A motion for a new trial was overruled, and the defendant excepted.

1, 2. One of the two special assignments of error is, because the court, on the trial of the case, over objection of the defendant, admitted the testimony of a witness with respect to the dying declara-

tions of the deceased, as follows: "He [the deceased] said that old Pity [the defendant] sent for him to go down there on Wednesday, and he couldn't go, and she sent back up there Friday for him to be sure to come there that night." "This old negro told me that this woman had sent him word by her children to come up there." The objection urged to this testimony is, that, being a part of the dying declarations of the deceased, it could not be used to prove a conspiracy between the defendant and one Chris Heard, who, the dying declaration tended to show, actually fired the fatal shot. It is insisted that the evidence is purely hearsay, and that the defendant could not be bound by what was said by the children in her absence and without her concurrence. These excerpts from the evidence omit a very important part of the dying declaration, which we think makes the declaration objected to admissible. The first excerpt stops in the middle of a sentence, and the witness is not made to say all that he did say on the stand. What the witness did say, as appears from the brief of evidence, was as follows: "I asked him who shot him and how it was done, and he told me that. He said that old Pity [the defendant] sent for him to go down there on Wednesday, and he couldn't go, and she sent back up there Friday for him to be sure to come that night, and that he did go, and when he went down there he told her he was there and wanted to know what she wanted, and she told him to come in and he would see what she wanted, and he walked in, and he said Chris shot him." From the excerpts standing alone it may be questionable whether that part of the declaration was admissible; but when the declaration goes further and says: "when he went down there he [the deceased] told her he was there and wanted to know what she [the defendant] wanted, and she told him to come in and he would see what she wanted, and he walked in, and he said Chris shot him," this makes a very different question. By this statement, made at the time of the killing, the defendant virtually admitted, according to the dying declarations of the deceased that she sent him word to come up there, that she invited the deceased to come into the house where Chris Heard was, to see what she wanted, and immediately, according to another part of the dying declaration, Chris Heard shot him (the deceased). The admissibility of the dying declaration is not open to the objection that it is hearsay evidence because the children who delivered the message to the deceased to come to the defendant's house were incompetent to testify.

Under section 1026 of the Penal Code of 1910, dying declarations are admissible in evidence in a prosecution for the homicide of a person, if made by the latter when in the article of death and conscious of his condition, "as to the cause of his death and the person who killed him." It will thus be seen that such declarations are limited to the cause of the death, and the person who killed the deceased. This court has said, in construing this section, that "The conversation or conduct of the parties at and immediately preceding the homicide, and constituting the res gestæ of the occurrence, such as a witness would be permitted to relate, may, we think, be proved by the dying declarations of the person killed." *Wilkerson* v. *State,* 91 *Ga.* 729 (17 S. E. 990, 44 Am. St. R. 63). The instant case falls within that ruling. As to the alleged dying declaration, Dr. Amerson, who attended the deceased, testified: "I told him that he was going to die, that he couldn't live. In that statement he told me that before he was shot this woman Pity Harris sent him word to send her some meat down there, and he refused to send it, and after he refused to send it she sent him word to come down there, and he went down there on Friday night, and when he got to the door he told her that he was there and wanted to know what she wanted, and she told him to come in and he would see what she wanted, and when he pushed the door open he received a load of shot in his arm from Chris Heard. He said Chris Heard shot him. He said he was positive of that because he saw him standing right facing him." The evidence first above set out, and objected to, if admissible, would tend strongly to show, in connection with other testimony in the case, a conspiracy between the defendant and Chris Heard to take the life of the deceased, and under the facts of the case it was admissible for that purpose. See, on the general subject of dying declarations, the editor's note to the case of Worthington *v.* State, 56 L. R. A. 353-359 (92 Md. 222, 48 Atl. 355, 84 Am. St. R. 506).

3. The law of voluntary manslaughter was not applicable to the facts of this case, and the court did not err in failing to charge the jury on that subject. Even if the statement of the accused made such a charge applicable, there was no timely request made therefor, and, as often ruled by this court, a failure to so charge under such circumstances is not error.

*Judgment affirmed. All the Justices concur.*