1. On the trial of a defendant indicted for murder, where the homicide is proved, the presumption is that the killing was murder. If there be circumstances of justification or mitigation, the burden of proving them is on the defendant, unless they appear from the evidence offered by the State. Fitzpatrick v. State, 149 Ga. 75 (3) (99 S.E. 128); Mann v. State, 124 Ga. 760 (53 S.E. 324, 4 L.R.A. (N.S.) 934).
2. If one intentionally shoots another with a pistol, and the person shot dies from the wound, this presents no theory of involuntary manslaughter. Norton v. State, 137 Ga. 842
(4) (74 S.E. 759).
3. Under the evidence, the homicide was either murder or accidental homicide within the meaning of the Code, § 26-404. The law of involuntary manslaughter as defined in §§ 26-1006, 26-1009, was not involved. Hill v. State, 41 Ga. 484, 505-506. The court having charged the jury "that a person shall not be found guilty of any crime or misdemeanor committed by misfortune or accident, and where it satisfactorily appears there was no evil design, or intention, or culpable neglect," it was not error to omit to charge the law as relates to involuntary manslaughter.
4. The court instructed the jury: "The court charges you, gentlemen, the meaning of justifiable homicide. Justifiable homicide is the killing of a human being by commandment of the law, in the execution of public justice, by permission of the law in the advancement of public justice, in self-defense, or in defense of habitation, property, or person against one who manifestly intends or endeavors by violence or surprise, to commit a felony on either, or against any persons who manifestly intend and endeavor in a riotous or tumultuous manner to enter the habitation of another, for the purpose of assaulting or offering personal *Page 747 
violence to any person dwelling or being therein." This charge was not cause for reversal, as alleged, for either of the following stated reasons: "(a) That it was confusing to the jury. (b) That it was misleading to the jury. (c) That it was prejudicial, harmful, and injurious to him, in that it confused the jury by misleading the jury to understand that under the evidence and issues the question of justifiable homicide as charged was involved, and that if under the evidence no justifiable homicide as charged was shown, that a verdict of guilty of murder must be returned. (d) That there was no evidence and no issue in the case to support the charge of justifiable homicide as charged. (e) That it was prejudicial, harmful, and injurious to him, in that it misled the jury in making the jury believe that unless the defendant, Willie Walton Jr., proved by evidence that the same was justifiable homicide, as charged, that the same could be nothing but murder; it being insisted that the charge confused the jury, in that it led the jury to believe that the verdict by necessity must be guilty of murder, or not guilty of murder, if the evidence showed justifiable homicide as charged, and the charge restricted the jury to the issue guilty of murder, or not guilty of murder, on account of justifiable homicide." See Tate v. State, 46 Ga. 148; Ward v. State, 184 Ga. 566 (2) (191 S.E. 916), and cit.; Geer v. State, 184 Ga. 805 (193 S.E. 776).
5. On application of the rulings stated above to the pleadings and the evidence, the jury was authorized to return the verdict declaring the defendant guilty, with a recommendation; and there was no error in refusing a new trial.
Judgment affirmed. All the Justicesconcur.
 No. 13309. SEPTEMBER 24, 1940.
Willie Walton Jr. was indicted for murder by shooting Jimmie Walton with a pistol. The jury returned a verdict finding the defendant guilty and recommending that he be punished by imprisonment for life in the penitentiary. The exception is to a judgment refusing a new trial. On the trial it appeared that the defendant and the deceased were young negro men and brothers; and that the homicide was committed in the manner described, and in the county alleged in the indictment. Daisy Belle Edwards a witness for the State, testified in part as follows. On the day in question Jimmie carried witness in an automobile to the town of Parrott. Others in the automobile were Will Walton Sr. (father of defendant and deceased), a sister of witness, and another boy. The party arrived about four o'clock in the afternoon. Witness and Jimmie were walking along a street when they saw defendant "just walking around." Witness saw defendant and Jimmie in conversation for a few minutes, but did not know the conversation. Witness and *Page 748 
Jimmie went on up the street. Afterwards they got in a car of some one unknown to witness, "out on the park ground in Parrott," near the store of Mr. Cook, where they remained for "a long time." Defendant walked up with Jack White about eight o'clock at night. "What took place at the car, when little Willie [defendant] walked up, Jimmy asked him did he have his gun, and he took it out of his pocket, and he went to breach it back, and it went off and shot him." Witness further testified: "No sir, I didn't testify that before the grand jury. . . I told the grand jury that he walked up there and shot. Yes, sir, I told them that he walked up there and hollered and pulled out his pistol and shot him. . . I told Mr. Turner and Mr. Bolton the same thing right after this thing happened, when they investigated the shooting. I told them that that night. . . Q. Right after this thing happened, when you talked to Mr. Bolton that night, wasn't that the truth about the situation then? A. No, sir. Why I told Mr. Bolton something that wasn't true, I was scared, I reckon. . . I was scared down there before the grand jury. I was scared of Mr. George Perry. I am not scared to-day. . . Nobody tried to bother me in the grand-jury room. Somebody had told me before what to say — Mr. George Perry. He lives up there where I stay. He told me that, that morning coming on, he told me to tell what I told that night. Yes, sir, to tell the truth, to tell what I told that night. . . Nobody had threatened me that night when I made that statement to Mr. Bolton. Nobody had said anything to me what I ought to tell that night when I made that statement. . . Mr. Perry didn't threaten me none. He said they would put a fine on me if I didn't say it that way." On the cross-examination the witness described the actual killing: "I was sitting in the car. And Jimmy was standing by me. And Willie and Jack come up. And Jimmy asked him did he have his pistol, and pulled it out, and unbreached it; and nothing was said about any money, or any fuss, or any loan of any description. And he went to breach it back, and it went off; and Willie said, `Oh Lord! I have shot my brother.' And when he laid him down on the ground, he grabbed his pistol and run." On recross witness testified: "Willie Walton didn't point that pistol at all at Jimmy Walton. He just went to breach it back, and had one hand on the gun barrel and one on the other end, and it went off, and he said, `Oh Lord! I have shot my brother,' and picked it *Page 749 
up and run. And the reason we all run was that a big crowd gathered and we didn't know what would happen."
Jim Mack Joines testified, in part: "On that occasion, I was coming along there in front of Cook Bros. Store, where it happened. This happened right side of a car. Before this took place, I was just coming along there and some negroes was there facing one another. . . I didn't see but three there. There were two men and one woman. The woman was in the car. The two men were standing in front of the car, and she was sitting with her feet on the running board. I did not see the shot when it fired. I heard it. I heard a negro holler. . . After the negro was shot, Willie Walton grabbed him and come back of the car with him and said, `Jimmy, you are shot. Somebody shot you,' and dropped him and run. That's what Willie Walton told Jimmy Walton. He ran across the highway to Mr. Perry's filling-station. After that, he started back up there and got as far as the highway and stopped. He didn't ever come back where his brother was." On cross-examination witness testified: "I was about fifteen feet, I guess, from that car when the shot was fired. A little further than from you to me. . . I don't know how it happened. No sir, I didn't hear Willie say, `Oh Lord, I shot my brother.' I heard the boy holler that got killed. No sir, I didn't hear Willie holler. And I don't know how it occurred. And I say, Willie broke and run. And he had something in his hand and throwed it away."
Joe Moore testified, in part: "I made an examination of the wound. He was shot through the heart. . . The bullet went straight in." Otis Sherman testified, in part: "I saw Jimmy Walton and Willie Walton just before this shooting took place. . . They were out there across the railroad in a little park. Willie asked him — he asked him to give him two dollars to get his shoes out of the post-office, and he said that he didn't have it, and that he would pay him next week. . . I did not stop and listen to the conversation. Yes, sir, that was everything I heard. And I had got about thirty-five yards before I heard the shot."
In his statement before the jury the defendant said: "Me and him was standing down there talking, and he asked me to loan him two dollars to get a package out of the post-office, and I told him I didn't have it, that I would give it to him Monday; and I went back, and me and Jack got together, and we come back, and him and *Page 750 
Daisy was sitting in the car, and he asked did I have my gun, and I said yes, and took it out and unbreached it and went to breach it back, and it went off; and he was standing up there side of the car, and Daisy was sitting inside there with her feet on the running board, and it went off unintentionally. I didn't go to shoot him, and when I shot him I grabbed him, and said, `Oh Lord, I shot my brother,' and grabbed him and laid him down on the ground, and grabbed my gun and run."
Hub Bolton, the deputy sheriff, testified as to a statement made by defendant to him: "He said he had his pistol stuck right up in his waist, with the barrel sticking up, and it went off and killed his brother. He didn't say nothing about unbreaching it, but said that he had it in his waist, with the barrel sticking up. The way I got the pistol, I found it in Mr. Whaley's garden. He carried me and showed me right where the pistol was. . . When I walked up there and asked Daisy Belle Edwards about this, she said she seen it. She said that day that Willie Walton came up there and hollered and shot his brother, and that was all that was said. I did not threaten her in any way to get her to make that statement to me. Mr. George Perry was not there. Nobody there did not threaten her or tell her what to say. That was, I reckon, forty or fifty minutes after the shooting." J. A. Turner, sheriff, testified: "I had a conversation with him after he was arrested. . . He did not say anything about having his gun out showing it to his brother and it went off. He said he had it in his overall pocket, and it went off and shot his brother. . . He said he went to pull it out and it went off and shot him." George Perry testified: "I didn't tell Daisy Belle Edwards that if she didn't come in and testify before the grand jury, and testify just exactly like she told Mr. Bolton about this crime, that I would be sitting in the grand-jury room, and would put her in jail if she didn't. I didn't tell her anything about it. I asked her about some more witnesses. I did not tell her what to testify in this case; the case has never been mentioned before me. I didn't tell her that if she didn't tell what she told that night, that I would be in the grand-jury room and would do something to her, never mentioned it to her." On cross examination he testified: "Jimmy Walton did not live on my place. He lived with his daddy. He worked for me for wages six months this year. I thought a heap of him; he was all right. *Page 751 
Yes, sir, I was in the grand-jury room when this girl testified. I think I asked her a few questions. I think I asked her about the position she was sitting, and she mentioned about the car. She was sitting in the seat of the car and she was leaning out of the door, and I asked her where Jimmy was — wasn't he up against the car when he shot; and she said he was, and she was in the car, and he was leaning up against the car. . . She lives on my place and works there. I didn't tell her anything at all about what to tell. . . Well, the way she stated the accident happened before us in there, that he reached back and got his pistol out of his back pocket and hollered, `Whoopee,' and just as he come up like this, it shot. She never did say that he pointed it at him. I don't remember about her saying they had any fuss. I never heard of them boys fussing. Very fond of each other. Willie didn't have no reason to kill him."