1. The preliminary evidence was sufficient to establish a prima facie foundation for admission of the testimony as to statements made by the deceased and offered by the State as dying declarations.
2. Where, on the trial of a husband for the alleged killing of his wife by shooting her with a shotgun, there was evidence of a statement by the wife to the effect that her husband had intentionally shot her without cause, and of circumstances authorizing its consideration as a dying declaration, admission of evidence of an additional statement indicating that she "wanted something done with him," but clearly based on her declaration and claim that he meant to kill her and shot her without cause, was not sufficient ground for a new trial, even though such additional statement might not have come within the limited purpose for which dying declarations may be admitted.
3. The judge gave in charge the Code, § 38-307, as to dying declarations, and instructed the jury generally as to their function in considering evidence of such declarations. If a more specific charge was desired, it should have been requested.
4. Where a husband is on trial for the alleged murder of his wife, evidence tending to show a course of ill-treatment and cruelty on his part toward her, continuing until shortly before the homicide, is admissible. Such evidence tends to show malice and motive, and to rebut the presumed improbability of a husband murdering his wife.
5. Where the judge in admitting testimony makes a statement in the presence of the jury, which the accused deems improper, he can not wait until after verdict and then complain for the first time in a motion for new trial.
6. Where the State introduced evidence tending to show previous ill-will and mistreatment on the part of the defendant toward his wife, mere failure of the court to instruct the jury as to the purposes for which such evidence might be considered, was not error.
7. If one with an intent to kill makes an attack upon another with a shotgun, and in the course of such attack, the gun is accidentally discharged, with the result that the other person is killed, the offense is murder. In no view of the evidence, did it involve the offense of involuntary manslaughter in the commission of an unlawful act, and the judge properly omitted to charge on such offense.
8. On the trial of a defendant indicted for murder, where the homicide is proved, the presumption is that the killing was murder. If there be circumstances of justification or mitigation, the burden of proving them is on the defendant, unless they appear from the evidence offered by the State.
The evidence authorized the verdict, and the court did not err in refusing a new trial.
 No. 14757. FEBRUARY 12, 1944.
Hubert Parker was indicted for the offense of murder in killing *Page 341 
his wife, Mrs. Waldeen Parker, on May 13, 1943, by shooting her with a shotgun. He contended that the shooting was accidental, while the State contended that it was intentional and malicious. He was convicted with a recommendation to mercy, and his motion for a new trial being overruled, he excepted.
His motion contained the usual general grounds, and 18 special grounds, added by amendment. In some of these grounds, he complained of admission of testimony of different witnesses as to declarations claimed to have been made by the deceased and offered by the State as dying declarations. He also, in some instances, complained of the admission of evidence of a different character. In still other grounds, he assigned error upon a statement by the judge in admitting testimony, and upon excerpts from the charge of the court, and omissions to charge.
It appeared from the evidence that on the date named in the indictment the defendant and his wife were at their home on a farm in Screven County. The wife was only about nineteen years of age, and he about twenty-one, although they had been married for about four years. At about noon, Mr. and Mrs. Alton Parker, who lived a few hundred yards away, were attracted by outcries, and on looking, saw the defendant bringing his wife in his arms along the road toward the Alton Parker home. They immediately sought to give aid, and Mrs. Parker reached them after they had come about 150 yards, and the defendant had set his wife on the ground in the shade of some bushes. The wife had been shot in her right leg, a little above the knee, and was bleeding profusely. It appeared that the shooting took place in the kitchen of their home. On the trial, the defendant contended that his wife had requested him to shoot a chicken, that she might cook it for dinner; that he went into the kitchen with his gun, asking which particular chicken he should kill; and on receiving reply that it made no difference, he started to leave the kitchen, when his gun accidentally struck some object and fired. There was evidence that his wife made statements to the effect that he came into the kitchen threatening to kill her, that he cocked the gun and pointed it at her heart, and that she caught the gun and knocked it down, with the result that she was shot in the leg. There was evidence of previous ill-treatment, including complaints made by the deceased to her mother in the presence of the accused. There was no eyewitness to *Page 342 
the shooting, and the State relied upon testimony as to declarations by the deceased, and upon circumstantial evidence. The State introduced over objection evidence of four different statements by the deceased, one of them being made to Mrs. Alton Parker, at or near the place where she first reached the defendant and his wife; one in the presence of several persons after the injured woman had been placed in a truck to be taken to a hospital; and two at the hospital on the same afternoon that the shooting occurred. The woman died at the hospital early Saturday morning, somewhat less than two days after she was shot.
As to the first statement and the circumstances under which it was made, Mrs. Alton Parker testified: ". . When I got there I went up there and asked them why in the world did they do that, how in the world come them to do that, so Hubert said, `It is an accident,' and so I said, `Well, how did it happen?' He was over her with his arm around her and he said, `Darling I love you, darling I love you,' and she said, `Well, you have killed me too,' and so I asked her, I says, `How did it happen?' and Hubert said on the back porch shooting a chicken, and he said, on the back porch shooting a chicken. I was so excited I couldn't say how many minutes from the time I heard the hollering until I was there and this statement was made. I reckon it was as much as five minutes. As to whether I remained there, well, when they said that, when they finished, she said, `Everything is turning black to me,' and she said, `Get a bucket of water, get a whole bucket full and pour every bit of it on me,' and I carried her a pan of water and a wash cloth and paper, through the excitement I couldn't find a fan. I carried a newspaper down there. I couldn't find a fan, and I carried a newspaper down there to fan her with, and when I got back down there they asked me to go and get Alton to crank the truck and take her to the hospital, so I turned around and went back to get him, and told him what he said, and he went to the house, and I tried to make up my mind what to do. I was gone a little bit, and I finally decided to go to the railroad, and when I went to the railroad I saw him coming and I waited until he got there, and he said the doctor was coming. I waited until he got there, and we both went on back down there, and he said the doctor was coming. Alton beat me down there just a few minutes, and Hubert had gone to the house, and I *Page 343 
asked Waldeen, `Where is Hubert?' She made a statement then and there to me about how this happened. At that time I saw where she was bleeding from and where she was wounded. She was bleeding terribly. Judging from the nature of that wound, as to whether I would say that she was in a dying condition — I figured her condition was serious. I thought it was very serious. She seemed to think she was going to die. As to whether she was conscious of her condition, she seemed to be so as much as anybody could, and then under those circumstances she made a statement, that is correct. This was on Thursday, I wouldn't be positive about the time of the day, but it was just before noon; that was on Thursday, and she died Saturday morning if I make no mistake, I couldn't tell you exactly what time. Whenever she made her statement to me that was the third time I was there. I couldn't say how long that was from the first time I was there, anywhere from six to seven minutes I guess. I will state to the jury the statement she made to me as to the cause of her death and the wound. I asked her, I said, `Waldeen,' I says, `how come Hubert to shoot you?' and she said that Bernice and them told him a whole mess about her and Sid Parker and he shot her; she said she was in the kitchen cooking dinner, and doing the very best she could. As to whether she made any statement then with reference to it, well you know she asked me had I ever heard of anybody being like that and getting over it. She didn't say anything about thinking she was going to get over it; she just asked me if I had ever heard of anybody being like she was and living, and I told her, well, I never had heard very much, and it seemed like she was under the impression, I don't know just how to express it, but I tried to encourage her because I was with her while they were cranking the truck. While I was there she said everything was turning black and to get a bucket of water and pour on her. I went with them to the hospital."
On cross-examination, the same witness testified: "She was shot in her right leg just above her right knee and was bleeding terribly from it. . . She was wounded and I had not had any experience in anything like that before. She wanted to improve and I went on with her. I would say she stayed in her right mind all the time after I went up there. She wanted to know of me if I had ever known of anybody to get well who was wounded like *Page 344 
that. That was while she was talking to me there. At that time she begged us to hurry and get her to the hospital, and she said, `I am ruined for life if I live.' . . I saw his clothes that he had on, Hubert's clothes, they were saturated with blood where he had toted her and got blood over him."
As to the second statement, that is, the one made in the truck, Mrs. E. E. Miller testified: "My husband and I went over in that direction. We went to Mr. and Mrs. Alton Parker's home. . . Dr. Doster's car was behind us, and Alton Parker and his wife and Hubert and his wife drove up, and Mrs. Hubert Parker was in the pick-up truck; she was lying in the back part of the pick-up truck, and I would consider her condition serious; she was wounded in the knee or just above the knee on the right-hand side. As to whether she was weak and in a critical condition then, well, Dr. Doster asked for some ammonia, and I would say she was in a weak and critical condition; she said everything was turning black. She made a statement there at that time. As to where I was when the statement was made — Dr. Doster asked for some ammonia, and her husband had gone to his house to get the ammonia, and I think Mrs. Alton Parker said it was already down there, and Dr. Doster asked for some water to bathe her; I was in the pick-up truck, and she was lying on a pillow in my lap, her head was, when the statement was made. That was after they had brought her down near the Hubert [Alton?] Parker home, that is the time I saw her in the pick-up. She made a statement there then in my presence with reference to this shooting. From the condition I saw her in and the nature of that wound and what she said about everything turning black, I would say that she was conscious of her condition. My statement is that she was conscious of her condition, and at the time she made that statement I would consider she was in a serious condition. She wanted to go to the hospital, and she was asking them to please hurry. She was in a serious condition. As to how long this statement was made after the shooting occurred, I could not say, I couldn't say what time she was shot, but they had just gotten her up to Mr. Alton Parker's. As to whether she made any statement as to what she thought her condition was at that time, well nothing except she said everything was turning black and to please hurry. While I was in the pick-up truck with this woman with her head in my *Page 345 
lap she made a statement with reference to this shooting. Her brother asked her why he did it, and she said something a child told him about Sid. That is the statement she made, that was made in my lap."
On cross-examination, the same witness testified: "As to whether she expressed anything about her condition to me, well except she said her leg was dead, and everything was turning black. That is when Dr. Doster asked for ammonia. She never did make any expression while I was there she did not have any hope of living." Two other witnesses, Dugal Newton and E. E. Miller, testified regarding the statement that was made by the deceased in the truck. As to the third statement, being the first one that was made at the hospital, Mrs. Ashley Waters, a sister of the deceased, testified: "I stayed up there [at the hospital, to which the witness had gone some time after two o' clock] till I would say about four o'clock is when I left there and came back home. Just as I was leaving his mother and my mother and all of them was coming in there as we were leaving out . . My sister was in a serious condition when I got up there on Friday, and you see on Friday was when they were supposed to operate, and I think it was four o'clock on Friday, and they started to operate but she was so weak she couldn't stand it, and she kind died away, and they started to operate on her, and carried her to the operating room, and she was so weak she died away and they couldn't operate on her, and she died Saturday morning. . . While I was at the hospital in Millen my sister made a statement to me, or in my presence, about the shooting. That was on Thursday afternoon. She was conscious of her condition at the time, and she was in a critical condition; it didn't seem to me that she thought she was going to get well from the way she talked to me. As to what I said, if anything, when I went in, the first thing I says, `Waldeen, how are you feeling?' and she says, `I don't feel so good, my leg is hurting me,' and Hubert was standing at the head of the bed, and I says, `Hubert, why did you do this?' and he says, `I was shooting at a chicken and I accidentally shot Waldeen,' and I says, `Why didn't you catch the chicken?' and he says, `We always shot them,' and she says, `Come on Hubert and let us tell Aline the truth,' she says, `I might die and I want her to know the truth.' Following that she made a statement as to how it happened. She told *Page 346 
me how it happened. She said that he was plowing cotton that morning and when he got to the end of the row he hitched the mule at the fence and come in the kitchen where she was cooking dinner, and he told her he was going to kill her, and she says, `I didn't believe it,' and he went in the house and got the gun and came back in there where she was and cocked the gun, and she says, `Put it on my heart, and then I knew he was going to kill me and I reached up and caught the gun and knocked it down,' and she said, `He meant to kill me right then; he put it right on my heart right then.'"
On cross-examination, Mrs. Waters testified: "There wasn't anybody in the room but me and her when that statement was being made, he was in there when she told him to come on and tell me the truth, but he wasn't in there when she told me how it happened. . . As to whether she was getting along all right under the circumstances, she was in a serious condition, and she finally died. . . As to whether she didn't make any statement that she was going to die, I've done told you she said she might die."
As to the fourth and last statement, Mrs. Ila Ree Parker, mother of the deceased, testified: "Mrs. Waldeen Parker was my daughter; she was the wife of the defendant in this case . . I was not home on the 13th day of May that morning, I . . saw my daughter when I got up there [meaning at the hospital Thursday afternoon]. She was in bed. Her condition was serious . . She died Saturday morning I will say around six or seven o'clock, anyway it was early Saturday morning. She never did revive or recover. There was a consultation there among the doctors on Friday with a view of operating, but they did not operate, they carried her in the operating room and she died away, and they had to carry her back to her room. She wasn't strong enough to stand an operation, and they didn't operate on her and the next morning she died, and she died from that shot in the leg, that gunshot would. I was there Thursday afternoon. Thursday afternoon she made a statement in my presence about the shooting. She was conscious of her condition at the time; she did not think she was going to get well. I asked her, I says, `Waldeen, how in the world come Hubert to shoot you,' and she said, `Well, he went to the house and was fussing at me, like he always had been, and he told *Page 347 
me he was going to kill me, and he went in the house and got the gun and came back in the kitchen and I didn't believe he was going to kill me, and he cocked the gun and pointed it on my heart, and I knew then that he meant to kill me, and I knocked the gun down and it went in my leg,' and she said, `He loaded his gun Tuesday morning to kill me, and I run out and got out of his way then;' and this was on Tuesday afternoon, and I says, `Waldeen, do you want us to do anything with him?' and she says, `Yes,' and she says, `Aline, she told me if I lived that she would see that I never lived with him another day, and if I die I want you all to have something done with him; right in my kitchen he loaded his gun Tuesday morning to kill me and I run and got out of his way.' That is just what she said. That was on Thursday that she told me this."
On cross-examination, the same witness testified: "As to whether the truth about it is that she bled to death and that the cause of her death was the losing of blood from that wound and not from the wound itself — no sir, I think she bled to death, of course inflammation could have set up." On re-direct examination: "As to whether she was getting along all right, she didn't look so to me, she wasn't from the looks and she didn't eat but just two or three mouthfuls at a time. She did not say anything about what she would do when she got out of the hospital. Her leg was hurting her, she says, `My leg is hurting me so bad I can't hardly stay.' She never said anything about her condition other than her leg was hurting her, and what I told Mr. Lanier. She said if she died she wanted something done with Hubert, she knew she was nearly dead then, she said, `If I die I want something done.' She didn't say she wasn't going to live, that she was going to die."
Still other evidence was introduced, some over objection, and so far as necessary, reference will be made thereto in the opinion. The defendant made a statement to the court and jury, asserting that he and his wife had lived happily together, and explaining how, as he contended, the shooting occurred, claiming that it was accidental, as above indicated.
He introduced no testimony.
Hubert Parker was indicted for the offense of murder in the killing of his wife, Mrs. Waldeen Parker, on May 13, 1943, by shooting her with a shotgun. His motion for a new trial as amended was overruled, and he excepted.
1. In the first special ground, it was contended that the court erred in admitting the following testimony of Mrs. Alton Parker: "I said, `Waldeen,' I says, `How come Hubert to shoot you?' and she said that Bernice and them told him a whole mess about her and Sid Parker and he shot her; she said she was in the kitchen cooking dinner and doing the best she could. As to whether she made any statement then with reference to it, well you know she asked me had I ever heard of anybody being like that and getting over it; she didn't say anything about thinking that she was going to get over it, she just asked me if I had ever heard of anybody being like she was and living, and I told her, well, I never had heard very much, and it seemed like she was under the impression, I don't know just how to express it, but I tried to encourage her because I was with her when they were cranking the truck. While I was there she said everything was turning black and to get a bucket of water and pour on her."
In the brief for the defendant, it is stated that this evidence was admitted by the court under the rule as to res gestae, and also upon the theory that it was admissible as evidence of a dying declaration. The defendant objected to it upon the grounds that the declaration to which it related was no part of the res gestae, and that no sufficient foundation had been laid for admission of evidence of a dying declaration, it being insisted that there was no evidence that the declarant was in the article of death, or, if so, that she was conscious of such condition.
The testimony of the same witness is given more fully in the statement, and from all the circumstances to which she testified, we think it could have been inferred that the declarant was in the article of death and conscious of her condition. As shown by this evidence, the decedent had been shot just above the knee with a shotgun, and was bleeding "terribly." She had just stated to her husband, "You have killed me." She had also stated, "Everything is turning black," requesting that water, a whole bucket full, be poured upon her. The witness further testified that judging from *Page 349 
the nature of the wound, she thought the woman's condition "was very serious, she seemed to think she was going to die;" and she did die within two days.
It is true that the declarant also inquired if the witness "had ever heard of anybody being like I was and living," begged to be hurried to the hospital, and said, "I am ruined for life if I live," but these expressions did not necessarily rebut the other statements and circumstances from which it could have been inferred that she believed she would die. "It is not necessary for the State to show affirmatively that a person who had been shot said he was in a dying condition, in order to admit proof of his declarations, if in point of fact he was in articulo mortis, and the circumstances were such that he must have known that he was in a dying condition." Washington v. State, 137 Ga. 218
(73 S.E. 512). "On the trial of a murder case, if at the time of making declarations the condition of the wounded person making them, the nature of his wounds, the length of time after making the declaration before he expired, and all the circumstances make a prima facie case that he was in the article of death, and conscious of his condition when he made the declarations, such declarations should be admitted in evidence by the court under proper instructions to the jury." Green v. State, 154 Ga. 118
(7), 137 (3) (113 S.E. 536). Where a statement is susceptible of two constructions, one that the declarant realized he was in a dying condition and the other that he might recover, and where the other circumstances are sufficient to show prima facie that the declarant was in the article of death and conscious of his condition, a declaration as to the cause of his death and the person who killed him is not to be excluded because of such ambiguity. Bird v. State, 128 Ga. 253 (3) (57 S.E. 320). In the instant case, the preliminary evidence was sufficient to establish a prima facie foundation for admission of the testimony of Mrs. Alton Parker as to the statement made to her by the deceased, and the court did not err in admitting the testimony. The ultimate determination as to whether the declarant was in the article of death and realized her condition, was of course a matter for the jury, but it appears from the record that the judge instructed the jury fully as to their province.Findley v. State, 125 Ga. 579 (54 S.E. 106); Davis v.State, 120 Ga. 843 (3) (48 S.E. 305); Barnett v. State,136 Ga. 65 (4) (70 S.E. 868); *Page 350 Jefferson v. State, 137 Ga. 382 (3) (73 S.E. 499);Phillips v. State, 163 Ga. 12 (2) (135 S.E. 421).
The case differs on its facts from Whitaker v. State,79 Ga. 87 (3) (3 S.E. 403); Howard v. State, 144 Ga. 169
(86 S.E. 540), and Roe v. State, 164 Ga. 95 (2) (137 S.E. 824), where the statements clearly indicated some hope of recovery. In the instant case, the deceased never did at any time clearly indicate any such hope.
Moreover, in the three decisions which have just been cited, it appears that this court did not take into consideration any preliminary circumstantial evidence, whether or not such evidence may have been presented in the record. Whether correct or incorrect, the rulings in these cases will not be extended. Although the case of Glover v. State, 137 Ga. 82 (2) (72 S.E. 926), was one in which the deceased was shot in the leg with a shotgun, it was stated in the decision that there was "no fact brought out in the evidence which would serve to show that the decedent believed that death was imminent at the time of making the alleged statement." Such an observation could not be properly made in the instant case, in view of the testimony as to the nature of the wound, the state of the decedent's mind, and the other circumstances.
With one exception, to be dealt with in division 2, infra, what has just been said in reference to the testimony of Mrs. Alton Parker will apply also, on principle, to the testimony of all other witnesses as to declarations of the deceased, and will thus control adversely to the defendant the other grounds of the motion for a new trial relating to dying declarations, namely, ground 3, as to testimony of Mrs. E. E. Miller; ground 4, as to testimony of Mrs. Ila Ree Parker; ground 7, as to testimony of E. E. Miller; ground 8, as to testimony of Dugal Newton; and ground 10, as to testimony of Mrs. Ashley Waters. If the foundation was not laid independently in the testimony of each of these witnesses, what had been stated by the first witness, Mrs. Alton Parker, could have been considered as additional preliminary proof. The facts necessary to be shown before declarations are admissible as dying declarations may be proved by evidence as to the nature of the wound and other circumstances, and by witnesses other than those testifying to such declarations. Oliver v.State, 129 Ga. 777 (59 S.E. 900); Simpson v. State,168 Ga. 598 (2) (148 S.E. 511); Gibbs v. State, 190 Ga. 207
(4) (9 S.E.2d 248); Emmett v. State, 195 Ga. 517,533 (25 S.E.2d 9). *Page 351 
As stated above, the decision in Whitaker v. State, supra, appears to have rested solely upon statements of the deceased as to his mental condition, and a different ruling is not required here because of the statement in that decision that testimony of one of the witnesses "threw no light on the question of [declarant's] condition at the time when he made declarations to other persons not then present." It may be observed that theWhitaker case has never been cited by this court upon any point, although as to this particular point, there are several later decisions. However, when limited to its particular facts, the ruling there made does not, in any view as to its soundness, conflict with our present ruling.
2. In ground 4, the defendant complained of admission of the following testimony of Mrs. Ila Ree Parker: "I says, `Waldeen, how in the world come Hubert to shoot you?' and she says, `Well, he went to the house and was fussing at me, like he always done, and he told me he was going to kill me, and he went in the house and got the gun and come back in the kitchen; I didn't believe he was going to kill me, and he cocked the gun and pointed it on my heart, and I knew then that he meant to kill me, and I knocked the gun and it went in my leg;' and she said, `He loaded his gun Tuesday morning to kill me and I run and got out of his way then;' and I says, `Waldeen' — this was Thursday afternoon, and I says, `Waldeen, do you want us to do anything with him?' and she says, `Yes,' she says, `Aline, she told me if I lived that she would see that I never lived with him another day,' and if she died, `I want you all to have something done with him, that right in my kitchen he loaded his gun Tuesday morning to kill me and I run and got out of his way,' that is just what she said."
The defendant objected to all of this evidence upon the ground that no sufficient foundation had been laid, and objected separately to the part, "I says, `Waldeen, do you want us to do anything with him?' and she says, `Yes,' she says, `Aline, she told me if I lived that she would see that I never lived with him another day,' and if she died, `I want you all to have something done with him.'" As to this part of the testimony, the objection was as follows: "I want to also ask the court to exclude from the testimony all the evidence given by her as to dying declarations, all evidence given by her except that touching the statement that was made by the deceased now in the record as to how it happened. That part *Page 352 
of the testimony about wanting him prosecuted, and wanting something done with him, and that he didn't expect to live with her . . is irrelevant testimony. The dying declarations and the testimony as to the res gestae as to what happened at the time the crime was committed and nothing afterwards. Now the statement that she made there about the shooting and about how it happened on the day, I am not offering any objection at this time to that part of it. I have already objected to that, but I ask the court to exclude that part of the testimony for the reason that it is prejudicial and harmful to the rights of the defendant on trial."
It is insisted in the brief that testimony as to what the deceased wanted done with the defendant went beyond the proper scope of evidence of a dying declaration, which should be limited to the cause of the declarant's death and the person who killed him. Code, § 38-307; Hawkins v. State, 141 Ga. 212 (4) (80 S.E. 711); Harris v. State, 142 Ga. 627 (2), 629 (83 S.E. 514).
Assuming that the objection made was sufficient to raise this question, and that the part of the testimony last-above quoted did not as a matter of fact come within the limited purpose for which evidence of such declarations may be admitted, we do not think its admission was such error as to require a new trial under the circumstances appearing. This statement of the deceased was manifestly based upon her previous declaration to the effect that the defendant meant to kill her and had shot her without cause. If that was the truth of the transaction, she expressed no more than what the law itself would declare ought to be done. In the circumstances, it would seem that upright and intelligent jurors must have placed their verdict entirely upon a determination as to whether the defendant did intentionally shoot his wife, as she claimed, without being swayed in the slightest degree by the evidence as to her wish, based solely upon such claim.
From what has been said in this and the preceding division, the court did not err in overruling ground 4 in its entirety.
3. In ground 14, it was contended that the judge erred in failing to charge the jury "that the person in the article of death, although conscious of her condition, must have abandoned and given up all hope of recovery; and that dying declarations were not to be considered as evidence against the defendant on trial unless and until the jury had first determined that the deceased was in the *Page 353 
article of death, conscious of her condition, and had abandoned all hope of recovery; and that dying declarations were never to be and could not be considered as evidence in the case on trial, unless and until the jury was satisfied that all of these requirements had been met." As we have just stated in the first division, it appears from the record that the judge did instruct the jury generally as to their proper function in considering evidence of such declarations, and if a more specific charge was desired, it should have been requested. Rouse v. State,183 Ga. 551 (2) (188 S.E. 904); Allen v. State, 187 Ga. 178
(7) (200 S.E. 109, 120 A.L.R. 495); Mitchell v. State,183 Ga. 217 (188 S.E. 3).
4. In ground 2, it was contended that the court erred in admitting the following testimony of Alton Parker, as to a statement made by the defendant regarding "trouble" with his wife: "Prior to this shooting I had not learned of any trouble between Hubert and his wife except what he himself told me. He was telling me about them having a little trouble, and I asked him if it was anything that he or his wife had done to cause this trouble, and he said it was just some talk that he heard, he hadn't seen anything at all, just some talk that he had heard, and I said something to him. I told him it was a kind of a poor way for a fellow to be doing not knowing at the time whether he was doing right, and if he kept on like that the first thing he knowed his wife would be hurt and they would be in trouble, and after I said what I did to him he said back to me that he wasn't going to bother her any more. On that occasion he made a statement as to how long he expected to live with her; he said he wasn't staying with her any longer than the war lasted, and when the war broke he wasn't staying with her any longer; and he said he damn sure wasn't going to pay no woman any alimony." From other testimony by the same witness, it appeared that this conversation occurred about three months before the shooting.
In grounds 5, 6, and 9, the defendant complained of the admission of testimony of three other witnesses tending to show ill-will and mistreatment on the part of the defendant toward his wife, all during the last few months. The defendant objected in each instance upon the ground that such evidence related to separate and distinct occurrences, and was irrelevant and prejudicial. There is no merit in these grounds. "When a husband is on trial for the *Page 354 
alleged murder of his wife, evidence tending to show a long course if ill-treatment and cruelty on his part toward her, continuing until shortly before the homicide, is admissible. Such evidence tends to show malice and motive, and to rebut the presumed improbability of a husband murdering his wife."Roberts v. State, 123 Ga. 146 (5) (51 S.E. 374). See also,Beckworth v. State, 183 Ga. 871 (190 S.E. 184); Cobb v.State, 185 Ga. 462, 464 (4) (195 S.E. 758).
In ground 11, error was assigned upon a statement made by the judge during the progress of the trial as to the purpose for which certain evidence was admitted. It does not appear that any objection was made to this statement at the time it was made, or at any time until after the verdict in the motion for new trial. Accordingly, this ground presents no question of error for determination. Pulliam v. State, 196 Ga. 782 (6) (7) (28 S.E.2d 139).
6. In grounds 12 and 13, it was contended that the court erred in failing to charge the jury that the evidence as to the defendant's previous ill-will toward his wife and his mistreatment of her (see division 4, supra), was admitted solely for the purpose of showing motive, trend of mind, and state of feelings of the defendant, and was not to be considered as evidence of guilt of the accused of the particular offense for which he was being tried. Even if such a charge would have been proper, the mere failure to give it was not error, there being no request. Holmes v. State, 131 Ga. 806 (63 S.E. 347);Baldwin v. State, 138 Ga. 349 (3) (75 S.E. 324).
7. In ground 15, it was contended that the court erred in failing to charge the jury as to the offense of involuntary manslaughter in the commission of an unlawful act, and in grounds 16, 17, and 18, error was assigned upon charges that were given, upon the ground that they excluded such offense, thus preventing the jury from finding a verdict for this lower grade of homicide. While the defendant insisted that the shooting was accidental, and objected to evidence of declarations of the deceased, yet since this evidence was allowed to go to the jury, he insists it would have authorized a verdict for involuntary manslaughter in the commission of an unlawful act, and that the court therefore erred in not submitting this offense.
We can not agree to this contention. In Epps v. State,19 Ga. 102 (5), 120 (7), it was held that if one makes an attack upon *Page 355 
another with intent to kill, and the gun of the assailant is accidentally discharged, with the result that the other person is killed, the offense is murder. There can be no involuntary manslaughter, where there is an intent to kill. Smith v.State, 73 Ga. 79 (3); Jackson v. State, 76 Ga. 473 (3). In the instant case, the evidence for the State, if true, showed an intentional killing. The defendant's statement was to the effect that it was purely accidental, and there was no intermediate ground. The court therefore properly omitted any reference to involuntary manslaughter in the commission of an unlawful act. Golatt v. State, 130 Ga. 18 (2) (60 S.E. 107); Drane v. State, 147 Ga. 212 (2) (93 S.E. 217);Goodwin v. State 148 Ga. 33 (1) (95 S.E. 674); Walton v.State, 190 Ga. 746 (2) (10 S.E.2d 755).
8. In ground 18, the defendant complained of the following charge upon the additional ground, that it omitted the element of intention, and was an erroneous statement as to the shifting of the burden of proof: "That is the definition of murder, and whenever the State establishes beyond a reasonable doubt that the life of an individual has been taken, and it was taken with a weapon likely to produce death, the law presumes malice and the burden is then cast upon the defendant to show that there was no malice, unless the evidence for the State discloses that fact, or the evidence for the defendant discloses that fact. If the evidence for the State, or the evidence for the defendant together with his statement, should disclose that there was no malice, then of course there would be no murder. The crime of murder can not be committed without the ingredient of malice being present at the time of the killing." There is no merit in this ground. Mann v. State, 124 Ga. 760 (53 S.E. 324, 4 L.R.A. (N.S.) 934); Fitzpatrick v. State, 149 Ga. 75 (3) (99 S.E. 128); Walton v. State, 190 Ga. 746, supra;Thompson v. State, 191 Ga. 222 (7) (11 S.E.2d 795).
The evidence authorized the verdict, and on careful examination of the record, we are of the opinion that no material error was committed. Accordingly, the judgment refusing a new trial must be.
Affirmed. All the Justices concur. *Page 356